370 A.2d 291

COMMONWEALTH of Pennsylvania

v.

**Clarence CORNISH, Appellant
(two cases).**

Supreme Court of Pennsylvania.

Submitted Oct. 20, 1975.

Decided Feb. 28, 1977.

258

Richard R. Lunenfeld, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

In a nonjury trial, Clarence Cornish was convicted of criminal conspiracy, robbery, and murder of the second degree. Concurrent sentences of life imprisonment, eight to sixteen years imprisonment, and five to ten years imprisonment were imposed. Post-verdict motions were denied and these appeals followed.[1] The appeals were later submitted to this Court without oral argument.

On March 17, 1976, we filed a per curiam opinion affirming the judgments of sentence.[2] Cornish then peti-

---

[1] An appeal from the judgment of sentence imposed on the murder conviction was filed in this Court. Appeals from the judgments of sentence imposed on the other convictions were filed in the Superior Court and certified to this Court.

[2] Our opinion read:

"Because appellant was convicted of murder of the second degree and sentenced pursuant to 18 Pa.C.S. § 1102(b), he lacks standing to contest the constitutionality of the sentencing provi-

tioned for oral argument claiming that the issues we said had not been presented to the trial court via post-verdict motions were, in fact, orally presented to the post-verdict motion court, and thus preserved for review under *Commonwealth v. Bailey,* supra. In *Bailey,* we held that issues not included in the written post-verdict motions would still be considered preserved for review if they were presented orally to the post-verdict motion court and entertained by that court prior to the announcement of our decision in *Commonwealth v. Blair,* supra. The Commonwealth, despite having previously asserted the issues were not preserved for review, filed an answer to Cornish's petition for oral argument stating it had no objection to the petition. Since the record was devoid of any indication that the issues had, in fact, been orally presented to the post-verdict motion court and since the opinion of the court disposing of the post-verdict motions indicated only the sufficiency of the evidence and legality of the life imprisonment sentence were raised in post-verdict motions, we entered an order remanding the record to the court of original jurisdiction to determine in an evidentiary hearing or other proceeding whether the issues disposed of by this Court as not preserved for review were, in fact, presented orally to the post-verdict motion court. That court filed a memorandum opinion which indicates that the issues were orally presented. Accordingly, we shall now consider the merits of those issues, without the need of oral argument.

[██] Cornish maintains that the statutory death penalty provision in 18 Pa.C.S.A. § 1102(a) is unconsti-

---

sion of 18 Pa.C.S. § 1102(a), See Act of December 6, 1972, P.L. 1482, No. 334, § 3, 18 Pa.C.S. § 1311 (Third Volume, p. 127); *Commonwealth v. Smith,* 409 Pa. 521, 187 A.2d 267 (1963). The other issues raised by appellant have not been properly preserved for review. See *Commonwealth v. Blair,* [460] Pa. [31], 331 A.2d 213 (1975) and *Commonwealth v. Bailey,* [463] Pa. [354], 344 A.2d 869 (1975) (filed October 30, 1975).

"Accordingly, the judgments of sentence are affirmed."

tutional and that, as a result, the life imprisonment sentence imposed on him pursuant to 18 Pa.C.S.A. § 1102(b) is illegal. Our previous order adequately disposed of this argument. See n. 1, supra.[3] Furthermore, to the extent Cornish's argument can be understood as challenging the legality of 18 Pa.C.S.A. § 1102(b) without reference to 18 Pa.C.S.A. § 1102(a) because it disallows judicial discretion in sentencing by providing for a mandatory sentence of life imprisonment in all cases of murder of the second degree, the contention is devoid of merit.[4]

■ At trial two eyewitnesses identified Cornish as one of those who participated in the crimes. Cornish urges admission of this testimony was error because no pre-trail line-up identification proceeding occurred. In effect, Cornish would have us rule that an eyewitness should not be permitted to identify the accused at trial unless such identification has been made prior to trial in a line-up proceeding. The absence of such pretrial identification may go to the weight to be given the in-court identification testimony but does not render it inadmissible.

■ Cornish also maintains the eyewitness in-court identification testimony was tainted and erroneously admitted because he was brought into the court by the sheriff in handcuffs in the presence of these witnesses before they testified. We find nothing in the record to support any such facts. Neither do we find anything in

3. Cornish has abandoned his challenge to the sufficiency of the evidence to support the verdicts which he raised in post-verdict motions.

4. Cornish cites no authority for his position but merely argues the mandatory sentence is unreasonable. Under the present statutory scheme, the mandatory sentence is imposed only in cases of murder of the second degree, or felony murder. It can hardly be said that the circumstances wherein a murder is committed during the commission of a felony vary to such an extent that the legislative determination to mandate one penalty is unreasonable.

the record to indicate the eyewitness testimony was objected to at trial for this reason. Cf. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

Next Cornish complains the trial court erred in permitting the testimony of the victim's wife. This is the background:

On the day before trial, the Commonwealth sought a stipulation as to the testimony of the wife of the victim of the murder, Mary McDermott, because at that time the district attorney believed the victim's wife would be unavailable to testify because she was emotionally upset. The stipulation was agreed to by counsel and Cornish. In essence, the stipulation stated Mary McDermott, if called, would testify that she identified her husband's body subsequent to the time of the crimes.

On the day of trial, but prior to the introduction of any evidence, the following occurred in open court:

Defense counsel: "The second motion, Your Honor, relates to a Commonwealth witness that the Commonwealth informed me this morning they intend to call, namely, the wife of the decedent. If Your Honor recalls, yesterday, after the defense stipulated to her testimony to the extent that she is the wife of the decedent, and she identified the decedent as her husband —to cover this I would request an Offer of Proof, and argue if she is not going to testify to other than facts we have stipulated to already, the purpose of her testimony would be to inflame passion, and, therefore, would be prejudicial."

The Commonwealth: "Responding, Your Honor, the witness to whom counsel refers is Mary R. McDermott, I indeed requested counsel to stipulate to her testimony. I think, first of all, such a motion is premature, namely, a motion for an Offer of Proof. However, I think the background is important. I would like to state the background—my reasons for calling her."

The court: "Yes, certainly."

The Commonwealth: "I spoke to Mrs. McDermott last Monday of this week, a very emotional upset woman, and I told her if it were a jury trial I would definitely want her to come in. However, since counsel agreed to waive her testimony, I called Mrs. McDermott last night, anticipating that she would not want to come in because of her emotional state, because she was very upset.

"Mrs. McDermott, last night when I spoke to her on the phone, said she had spoken to her brother—a retired judge from New York—and he advised her that he felt she had a duty to testify, and, also he suggested if something were to happen during the case, she would never forgive herself, because she might have played some sort of part, and she also went to her doctor yesterday, and her doctor said that despite her hypertension, she could come in and testify. And I left it up to her, and she said, 'I would like to come in, I feel I have a duty.'

"The reason I secured the stipulation, I explained to the Court, and I think the Commonwealth has a right to try the case any way it sees fit. And the way I see fit is to call the witness. I secured the stipulation in the event the witness was unavailable. So if the Court has any question concerning the circumstances, I will be glad to respond."

The court: "At the present time I will hold any determination in abeyance, pending her appearance. However, if her testimony is—if she is permitted to testify, we will bear in mind your comment, and certainly make sure anything she does say will not be inflammatory."

■■ When Mary McDermott was called to testify, defense counsel renewed his objection and the objection was overruled. She then took the stand and testified.

Her testimony which covers a mere two pages of the notes of testimony, established that she saw her husband during the morning of May 3, 1974, the day of the robbery and murder, and that she later identified his body. There is nothing in the content of the testimony to indicate that Mary McDermott displayed any emotion whatsoever while testifying. Moreover, counsel did not place in the record any statement as to her demeanor or the like either during or after she testified. Furthermore, the trial was conducted before a judge, sitting without a jury. Under the circumstances we find no error.[5]

Cornish next maintains that evidentiary use of an incriminating statement he made to the police should not have been permitted because it was not voluntary. Specifically, Cornish argues the confession was involuntary because 1) it was given while he was under the influence of narcotics and suffering from withdrawal, and 2) it was given as a result of a promise by police to make efforts to mitigate punishment. Following a pretrial hearing on Cornish's motion to suppress the statement, the suppression court determined the statement was voluntarily given and thus admissible.

It is well-established that on review from a finding of voluntariness, we must consider the Commonwealth's evidence and so much evidence presented by an accused as remains uncontradicted. *Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968). So viewed, the evidence established the following:

Cornish was arrested at approximately 10:00 a. m. on May 13, 1974 in Atlantic City, New Jersey and taken by

5. Cornish also objects to the prosecuting attorney's statement to the court that Mary McDermott was related to a retired judge from New York. While this reference was irrelevant and should not have been made, we are not persuaded any prejudice resulted.

police of that city to the police station. The Atlantic City police then notified the Philadelphia police department of the arrest and, as a result, Detectives Johnson and McMillan departed Philadelphia for Atlantic City where they first came into contact with Cornish at 12:45 p. m. the same day. Cornish had been held in a cell but was taken to a room containing some four or five desks when the Philadelphia detectives arrived. When he was brought into the room, the Atlantic City police handcuffed Cornish to a chair and left the room which was then occupied by Cornish and the two Philadelphia detectives.

Detective Johnson told Cornish he had been charged with the homicide of Thomas McDermott which occurred on May 3, 1974, at about 3:35 p. m. at a flower shop at 5220 Chester Avenue, Philadelphia. He also warned Cornish of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Following the warnings, Cornish was asked in a series of questions if he wished to waive his rights and he responded affirmatively. Immediately thereafter, Cornish answered questions which were asked solely by Johnson. Johnson reduced the questions and answers to writing. The statement was concluded by 1:45 p. m. and each page was read and signed by Cornish and signed by the two detectives as well as an Atlantic City police officer who came into the room while Cornish was reading the written statement.

Johnson further testified that while reading the statement Cornish corrected Johnson's spelling error and initialed it at each place he did so. Johnson also testified that Cornish remarked that Johnson was a bad speller. This statement was subsequently introduced at trial.

Additionally, Johnson testified that Cornish did not appear to be under the influence of drugs or alcohol; that he appeared to comprehend and understand everything which was said to him; that he did not request

food; that he was asked if he wished to be taken to the bathroom, but refused; that he made no complaints about his physical condition or the treatment afforded him by the authorities; and, that Cornish did not ask to be taken to a hospital.

After the statement was signed, Cornish was taken to the courthouse in Mays Landing, New Jersey. When he arrived there at 2:00 p. m., Cornish met with a lawyer, Phillip Schick. At 4:15 p. m., Cornish was taken before Judge Greenberg and was advised of his rights with regard to extradition. Cornish waived his rights and signed a waiver form. Cornish did not make any complaint to that court regarding his physical condition or the manner in which he was treated. The proceedings concluded at 4:30 p. m., at which time the officers transported Cornish to Pennsylvania where they arrived at the Police Administration Building at 5:35 p. m. Cornish was then placed in a room while paper work was completed. At 6:35 p. m., Cornish was given a meal. At 6:50 p. m., he was taken to the Police Detention Unit. Cornish was twenty-four years of age at the time.

Detective McMillan, who was called as a defense witness, testified in a manner which for the most part corroborated Johnson's testimony. He also testified that, as Cornish was being brought into the room in the Atlantic City police station and before Cornish was warned of his rights, he had asked Cornish if he used narcotics and that Cornish had responded affirmatively.[6] But McMillan also testified that Cornish appeared "alert, understands his surroundings, and apprehends what is going on." Finally, McMillan testified that he told Cornish, prior to his being warned of his rights, that " . . . it would be better for him to tell the truth, or words to

6. The record establishes that Johnson was not aware of this fact. Further, Cornish was apparently charged with a narcotics related offense by the Atlantic City police when arrested pursuant to the police bulletin concerning a warrant for his arrest for the homicide of Thomas McDermott.

that effect." McMillan was then asked for the exact words he used and he responded:

"I don't remember, but I did inform him in conversation, I told him the other guy [the robbery was committed by Cornish and another; the latter had been apprehended and had incriminated Cornish] had already ratted him out."

He was then asked:

"Yes, you said to him that it would be better for him if he told the truth if he spoke?"

and he responded:

"I don't think I said that, but I don't think I used the words 'better'."

Cornish testified that, during the time he was questioned, he was suffering from withdrawal from narcotics which included the following: watery eyes, running nose, difficulty speaking, nausea, gagging, hot flashes, difficulty breathing, and a headache. He further testified that he had asked the police to take him to a hospital and they refused. Additionally, Cornish indicated he had taken an injection of heroin the evening before his arrest.

The statement itself, which Johnson testified he wrote verbatim begins with a coherent narrative of the major events, following which short specific questions were asked and responsive and coherent answers were given to each question.

Cornish argues that the symptoms of withdrawal were "subjective" and does so in an apparent attempt to establish that his account of his physical condition was uncontradicted. As to this point, it suffices to say that many of Cornish's alleged symptoms should have been visually and audibly detectible and to that extent his account of his physical condition was contradicted. As previously noted the police testified that he appeared normal and Cornish was determined by a court of law within hours

after having given the statement to be capable of waiving his rights to an extradition proceeding. Finally, a photograph of Cornish was taken in the evening after Cornish was returned to Philadelphia, and despite the fact that no medication or the like was given to him, the photo, which was introduced at the suppression hearing, depicts none of the physical manifestations which Cornish testified to having.

That Cornish was a user of narcotics at the time of the questioning and that he had taken narcotics the night before his arrest were facts which were not contradicted. But those facts are merely factors in evaluating involuntariness; they are not determinative. "The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it." *Commonwealth v. Smith*, 447 Pa. 457, 460, 291 A.2d 103, 104 (1972). See also *Commonwealth v. Davenport*, 449 Pa. 263, 295 A.2d 596 (1972). As with the consumption of alcohol, drug intake does not automatically invalidate an incriminatory statement, *Commonwealth v. Smith*, supra, and the officers' testimony clearly establishes Cornish's will was not impaired by his drug intake at the time of the questioning. Compare *Commonwealth v. Davenport*, supra.

Cornish, in a related argument would have us rule, analogous to guilty plea situations, that the police should have inquired as to the extent of Cornish's drug intake once they were aware he used narcotics. We decline to create such a *per se* rule. The issue is one to be resolved by examining the totality of the circumstances, and the circumstances instantly established Cornish was in full control of his will. That is not to say that such an inquiry would not have been a preferable way for the police to have proceeded, but their not having done so does not automatically render the statement involuntary.

Cf. *Commonwealth v. McKinney,* 453 Pa. 10, 306 A.2d 305 (1973).

██ Cornish argues his statement was induced by promises of help from the police. The record shows McMillan told Cornish it would be better to tell the truth or words to that effect. The record does not support Cornish's testimony and present assertion that promises were made to him if he would confess. To the contrary, Cornish was asked subsequent to McMillan's comment to Cornish:

> "Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you?"

He responded affirmatively. Further, he was warned any statement would be used against him. See *Commonwealth v. Nathan,* 445 Pa. 470, 285 A.2d 175 (1971). Indeed, the remark itself did not promise anything in return for telling the truth though we note that such comments are best avoided. Finally, although such a remark is a circumstance to be considered, we are not prepared to say that merely telling an accused it would be better to tell the truth under the circumstances presented renders the statement involuntary. *United States v. Barfield,* 507 F.2d 53 (5th Cir. 1975) cert. denied 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975); *United States v. Springer,* 460 F.2d 1344 (7th Cir. 1972). Cf. *United States v. Glasgow,* 451 F.2d 557 (9th Cir. 1971). Compare *Commonwealth v. Eiland,* 450 Pa. 566, 301 A.2d 651 (1973); *Commonwealth v. Nathan,* supra.

██ In sum, although Cornish used narcotics the evening before his arrest, the record shows he was alert, responsive, not suffering physical discomfort, and in full control of his will. Further, despite the officers' remark to Cornish, no promises were made to him, he was warned any statement would be used against him subsequent to the remark and was never told it would be used

for him, see *Commonwealth v. Nathan,* supra, and he indicated he was not giving the statement as a result of any promises. Thus, in light of the other evidence and considering the circumstances as herein discussed, we rule the statement was properly admitted into evidence at trial.

■ Finally, Cornish argues that police questioning of an accused without an attorney being present constitutes a violation of his federal constitutional rights. An accused can control if and when questioning takes place and he can request a lawyer prior to being questioned if he so desires. *Miranda v. Arizona,* supra.

Accordingly, the judgments of sentence are affirmed.

ROBERTS, J., filed a concurring opinion.

MANDERINO, J., concurs in the result.

ROBERTS, Justice, concurring.

I agree with the majority the sentence of life imprisonment imposed on appellant was not illegal.* I also agree that no reversible error occurred in the admission of in-court identification testimony and appellant's incriminating statements.

I cannot agree, however, that no error occurred when the trial court admitted the testimony of the wife of the victim. The trial court may exclude evidence if its probative value is outweighed by the danger of prejudice, confusion, undue delay, or needless presentation of cumulative evidence. J. McCormick, Evidence § 185 at 438–40 (2d ed. 1972) ; see Fed.R.Evid. 403. Here, the testimony of the victim's wife was needed only to prove that she

* Appellant challenges the constitutionality of his life sentence because the death penalty is unconstitutional, and the Legislature intended to provide a lower sentence for lesser degrees of murder. I would not address the constitutionality of the mandatory imposition of life imprisonment in cases of felony murder, because appellant has not raised this claim.

had identified her husband's body after the crimes. The prosecution asked for, and obtained, a stipulation as to what her testimony would be. There was no need for her testimony once the defense agreed to this stipulation. Moreover, the trial court knew that she was emotionally upset; the possibility that her testimony would be prejudicial was clear. In these circumstances, appellant's objection to her testimony should have been sustained. In fact, however, her testimony did not turn out to be prejudicial. I concur in the result only because it was harmless error to admit her testimony. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Commonwealth v. Davis*, 455 Pa. 466, 317 A.2d 218 (1974).