526 A.2d 300

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Joseph Carmen D'AMATO, Appellant.**

Supreme Court of Pennsylvania.

Argued April 6, 1987.

Decided May 22, 1987.

474

Daniel M. Preminger, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Division, Alan Sacks, Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

Joseph Carmen D'Amato, appellant, was convicted by a jury of murder of the first degree and sentenced by that jury to death. He now brings a direct appeal to this Court[1] challenging the determination by the suppression court that his confession was admissible at trial, asserting that he was denied a fair trial due to certain allegedly improper remarks by the prosecutor, and claiming that he was denied the effective assistance of trial counsel. We affirm the conviction and the judgment of sentence of death. The record discloses the following.

Several residents living in or near the 2800 block of South Sydenham Street in South Philadelphia heard two gunshots (some of the residents thought they heard firecrackers) shortly after 10:00 p.m. on March 19, 1981. One of the residents, a former Philadelphia police officer, looked out from the rear of his house and observed a yellow or beige two-door coupe automobile in a parking lot across the back alley. He observed a white male "staggering, trying to flee the area, [who] looked as if he'd been injured." Notes of Testimony (N.T.), Trial February 1, 1983 at 52. Another resident heard the injured man, Anthony Petrone, exclaim "Oh my god—I'm shot. I'm shot." N.T. Trial January 31, 1983, at 98–99. The ex-police officer also observed two white males entering on either side of the car and watched as the car left the parking lot with its lights out and sped away. Other residents observed a yellow or beige or light brown midsize car, possibly an Oldsmobile or a Pontiac, exiting the parking lot and the alley with its lights out and two males in the car. Some witnesses heard a loud scraping sound, as of metal scraping against stone.

---

1. This Court has direct, appellate jurisdiction over such appeals. 42 Pa.C.S.A. §§ 722(4) and 9711(h)(1); Pa.R.A.P. Rule 702(b).

A Philadelphia police officer, who also lived in the 2800 block of South Sydenham, heard the gunshots at 10:05 p.m. and was the first to reach the victim, who was bleeding from a bullet hole in his right cheek. At this point, the victim was badly injured, and was thrashing about, speaking and screaming incoherently. The officer attempted to find out the name of his assailant, but the only intelligible word that the officer could understand was the word "Al." The victim was taken to nearby Methodist Hospital where he was pronounced dead at 12:20 a.m. the following morning. The cause of death was multiple gunshot wounds to the cheek and head, and to the left side of the front of his chest. He was also wounded in his hand (in an apparent unsuccessful attempt to protect his face). The cause of the wounds were two .38/.357 caliber bullets [2] that were probably fired from two different barrels, according to the Commonwealth's ballistics expert. No murder weapon was ever found.

Appellant became the chief suspect in another homicide, the shooting death of Anthony Bonaventura in Philadelphia on March 18, 1981, and an arrest warrant for that homicide was issued for appellant on April 7, 1981. Shortly thereafter, following investigation, Philadelphia police requested and obtained the issuance of a Federal Bureau of Investigation fugitive warrant on a charge of unlawful flight to avoid prosecution. On December 8, 1981, appellant and his girlfriend, Bernadette McFarland, were apprehended by F.B.I. agents in Newton Falls, Ohio, near Youngstown. Philadelphia police were notified of appellant's arrest and Detectives Michael Chitwood, Philip Checchia and Sergeant Daniel Rosenstein left Philadelphia by car that evening, arriving in Youngstown at approximately 2:30 a.m. on December 9, 1981.

The Philadelphia officers first saw appellant at about 11:50 a.m. later that morning at appellant's hearing in Akron before a United States Magistrate on the federal

---

2. The ballistics expert for the Commonwealth testified that the bullets could have been either .38 or .357 caliber, and that the calibers are essentially interchangeable.

fugitive warrant. At this hearing, appellant was advised by the magistrate of the charges against him, of his rights to remain silent and to counsel, and of his right to post bail to obtain his release. Following this arraignment hearing, appellant spoke with Sergeant Rosenstein regarding extradition, and agreed to waive extradition and return to Philadelphia. A state court proceeding was then held at the Barberton, Ohio courthouse, at which appellant was advised by the presiding judge of his right to contest extradition. After executing a waiver of extradition form, appellant was turned over to the custody of the Philadelphia police officers and returned to Mahoning County Jail in Youngstown for the night. The following morning, December 10, 1981 at about 6:30 a.m., appellant and Ms. McFarland were picked up and transported by the Philadelphia police officers together to Philadelphia, arriving at the Philadelphia police administration building at 1:57 p.m.

While at the administration building, appellant gave three separate written confessions, preceded in each instance by *Miranda* warnings,[3] to three homicides in the Philadelphia area. Between 3:45 p.m. and 4:50 p.m., appellant confessed to the murder of John Amato in February, 1981; from 5:01 p.m. to 6:05 p.m., appellant confessed to the murder of Anthony Petrone; and from 6:06 p.m. to 7:25 p.m., appellant confessed to the murder of Anthony Bonaventura.[4]

Regarding Anthony Petrone (the victim herein) appellant stated that he had seen the victim at a restaurant known as Cozy's at 16th and Ritner Streets. Appellant was alone

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** On January 11, 1983, appellant was convicted by a jury of murder of the first degree for the shotgun killing of John Amato, and was sentenced to life imprisonment. That conviction and sentence was upheld by the Superior Court on October 9, 1986. *Commonwealth v. D'Amato,* 361 Pa.Superior Ct. 633, 517 A.2d 1363 (Pa.1986).

On March 20, 1983, appellant was convicted by a jury of murder of the third degree for the shooting death of Anthony Bonaventura, and sentenced to a term of imprisonment of ten to twenty years thereon. That conviction and sentence was affirmed by the Superior Court on July 30, 1986. *Commonwealth v. D'Amato,* 358 Pa.Super. 625, 514 A.2d 198 (1986).

eating dinner when the victim came up to appellant and asked him if he was still interested in an insurance fraud scheme involving stealing and "cutting up" appellant's girlfriend's (Ms. McFarland's) car, a 1979 yellow two-door Oldsmobile Cutlass. Appellant suggested the two go for a ride to talk about it as the restaurant was crowded. They left the restaurant and drove off in Ms. McFarland's car, driving to a parking lot nearby.

In the parking lot, appellant (who said he had taken quaaludes that evening) became suspicious that the victim was "setting him up" for the killing of John Amato, and told Anthony Petrone to get out of the car. Appellant "got mad and crazy," walked around to the victim, pulled a two-shot .38 caliber Derringer (with two "over-under" barrels) from his coat pocket, and shot the victim twice at close range. Appellant stated that he had been alone when he shot Anthony Petrone.

Appellant was arraigned at 7:33 p.m. on December 10, 1981 before a judge of the Municipal Court of Philadelphia.

Pre-trial motions to suppress appellant's confessions and to suppress evidence seized during several searches conducted by law enforcement officers in Philadelphia and Ohio were filed, and a hearing was held on June 7, 1982. Following argument, Judge Murphy of the Court of Common Pleas of Philadelphia County, denied appellant's pre-trial motions on June 17, 1982.

After extensive voir dire proceedings beginning January 18, 1983, trial commenced on January 31, 1983. Appellant's confession was, understandably, the critical and most damaging evidence introduced at trial. The confession was corroborated by the witnesses from the 2800 block of South Sydenham area (who observed a car matching the description of Ms. McFarland's car leaving the parking lot), by witnesses who had seen both the victim and appellant at Cozy's Restaurant on the evening of March 19, 1981 (although they had not been observed together), and by William Boyle who testified that he gave appellant a .38 caliber Derringer earlier that day (which he later that day reported

as stolen to the police). In defense, appellant attempted to demonstrate to the jury that his confession of December 10, 1981 was involuntary because the Philadelphia police officers threatened to prosecute members of appellant's family for aiding and abetting appellant's escape unless appellant gave a confession.

On February 8, 1983, the jury returned a verdict of guilty of murder of the first degree. A sentencing proceeding was conducted the following day pursuant to section 9711 of the Sentencing Code, 42 Pa.C.S.A. § 9711, and the same jury sentenced appellant to death based on its finding of one aggravating circumstance (that appellant had been convicted of another offense, the murder of John Amato, for which a sentence of life imprisonment had been imposed, 42 Pa.C.S.A. § 9711(d)(10)) and no mitigating circumstances.

Post-verdict motions were denied and appellant was formally sentenced on July 25, 1984. This automatic appeal, in which appellant is represented by new counsel, was then filed.

■ Initially, although appellant does not challenge the sufficiency of the evidence, we hold that the evidence is clearly sufficient beyond a reasonable doubt to sustain his conviction for murder of the first degree for the willful, intentional slaying of Anthony Petrone.[5] We proceed, therefore, to appellant's allegations in support of his request for the granting of a new trial.

Appellant first contends that the lower court erred in denying his motion to suppress his confession which appellant alleges was involuntary and obtained as a result of unnecessary delay between arrest and arraignment in violation of *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), and our rules of criminal procedure. We reject this contention.

---

5. As in all appeals from a judgment of sentence of death, this Court will review the record to determine whether the evidence is sufficient to sustain the conviction for murder of the first degree. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

■ An accused may, of course, relinquish his constitutional right to remain silent. The waiver of that right must be knowing, intelligent and voluntary. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). A confession given as a result of custodial interrogation is admissible only if the accused's *Miranda* rights, including the right to remain silent and the right to counsel, have been explained to him and he has knowingly, voluntarily and intelligently waived those rights. *See, e.g. Commonwealth v. Barry*, 500 Pa. 109, 113–15, 454 A.2d 985 (1982); *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984).

■ The test for determining the voluntariness of a confession and the validity of the waiver of the right to remain silent is the totality of the attending circumstances. *E.g. Commonwealth v. Fahy*, 512 Pa. 298, 311, 516 A.2d 689, 695 (1986); *Commonwealth v. Whitney*, 511 Pa. 232, 241, 512 A.2d 1152 (1986). In examining the totality of the circumstances surrounding a confession, we have looked to a myriad of factors including the duration and methods of interrogation, the conditions of detention, the manifest attitude of the police toward the accused, the accused's physical and psychological state, and "all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination." *Commonwealth v. Crosby*, 464 Pa. 337, 346 A.2d 768 (1975). *See also, Commonwealth v. Bracey*, 501 Pa. 356, 364, 461 A.2d 775 (1983) citing *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) *and Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). Also a relevant factor in determining the voluntariness of the confession is the length of time between arrest and arraignment, specifically whether an "unnecessary delay" has attended arraignment. *Commonwealth v. Coach*, 471 Pa. 389, 393, 370 A.2d 358, 360 (1977) (citations omitted).

Our standard of appellate review of a suppression court's determination adverse to the criminal defendant is as follows:

When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Cortez,* 507 Pa. 529, 532, 491 A.2d 111, 112 (1985); *Commonwealth v. Whitney, supra,* 511 Pa. at 239–40, 512 A.2d at 1156–57.

■ Applying the foregoing principles to the suppression court's ruling in the instant case, we must affirm its determination that appellant's confession was voluntary. The suppression court made extensive findings of fact, most of which are not in dispute. Those findings include the following: appellant was advised of his *Miranda* rights upon his arrest by F.B.I. agents in Ohio prior to their interrogation of him, after which he confessed to the murder of Anthony Bonaventura but denied his involvement in the Anthony Petrone and John Amato homicides; Philadelphia police officers had no contact with appellant until December 9, 1981 when they attended appellant's preliminary arraignment before a federal magistrate who advised appellant of the charges against him, and of his rights to remain silent and to obtain counsel; appellant voluntarily waived extradition before an Ohio state judge after being informed of his right to contest extradition; appellant was questioned for the first time by Philadelphia police officers at 5:20 p.m. on December 9, 1981, after being again advised of his *Miranda* rights and of the charges against him, to obtain background information only; appellant called his family the evening of December 9, 1981; appellant was lodged overnight on December 8 and 9, 1981 at the Mahoning County Jail; appellant was handcuffed to Ms. McFarland during their trip from Youngstown to Philadelphia which began on December 10, 1981 at 6:30 a.m. and ended at 1:57 p.m. with arrival

at the police administration building; during the trip with the three police officers, appellant and Ms. McFarland stopped at least twice to eat (breakfast and lunch), to walk around, and to use restroom facilities; no questions were asked of appellant during this trip; appellant was advised of his constitutional *Miranda* rights at 3:15 p.m. prior to the confession of the murder of John Amato, again at about 5:00 p.m. prior to the confession to the murder of Anthony Petrone, and again at about 6:06 p.m., prior to the confession to the murder of Anthony Bonaventura; appellant was arraigned in Philadelphia at 7:33 p.m. on December 10, 1981. The suppression court also found that appellant made no complaint of mistreatment to either the federal magistrate or the Ohio state judge, that no officer of either the Philadelphia Police Department or the F.B.I. engaged in any conduct calculated to coerce appellant to waive his right to remain silent, and that when arrested appellant appeared responsive, calm, and uninjured.

Ms. McFarland testified at the suppression hearing on behalf of the defense. Her testimony was in most respects consistent with the police officers' accounts of appellant's arrest and transport, except that she described a mysterious stomach ailment that befell appellant and rendered him too ill either to eat or to waive his constitutional rights to remain silent and to counsel. She also testified that appellant, who had a tenth grade education, could barely read or write. The suppression court stated:

> This Court found Ms. McFarland's testimony unworthy of belief, and instead relied on that of Sergeant Rosenstein and Detective Chitwood, who spent some seven hours with [appellant] on the day of his confessions and both of them were unshaken in their testimony that [appellant] seemed oriented as to time and place; was alert, cooperative and understanding; and answered the questions posed by Detective Chitwood before each statement indicating that he understood his rights and was willing to waive them.

Suppression court slip op. at 13, Appellant's brief at 76.

Based on these findings, the suppression court concluded:

Such evidence from the interrogating officers has been held sufficient for finding a statement voluntarily given, *Commonwealth v. Cornish,* 471 Pa. 256, 370 A.2d 291 (1977), and in this case the Court is convinced that the Commonwealth adequately bore its burden of persuading the factfinder that defendant was healthy enough to make a knowing and intelligent waiver of his right to remain silent and to consult with an attorney.

*Id.,* at 14, Appellant's brief at 77.

We see no reason to disturb the court's determination that appellant's confession and waiver of his right to remain silent were knowing, intelligent and voluntary. Appellant's primary contention to the contrary focuses on the total elapsed time between his arrest in Newton Falls, Ohio and his interrogation, confession and arraignment in Philadelphia. His confession to the murder of Anthony Petrone was rendered some 50 hours after his apprehension by F.B.I. agents with arraignment occurring about one and one-half hours after he signed that confession. He was, indeed, as appellant emphatically observes, in the custody of law enforcement officials during that entire period. This factor alone, however, does not render a confession involuntary. We addressed a similar argument in *Commonwealth v. Boyd,* 461 Pa. 17, 334 A.2d 610 (1975) wherein that appellant had been interrogated for some ten to twelve hours before rendering his confession; we stated:

The only fact alleged by appellant as establishing involuntariness is the lengthy period of interrogation. On the other hand, the witness offering the statement testified that at the time appellant gave his statements he appeared "normal" and had been given a meal. Appellant testified and was questioned about the statement. He never indicated during his testimony that he was compelled in any sense to give this statement or that his will had been overborne. See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Under the "totality of the circumstances" test, the fact that appellant was questioned for an extended period

would be insufficient without more to establish that appellant's will was overborne and the statements were not freely given.

*Id.,* 461 Pa. at 32, 334 A.2d at 618.

So too in this case, while the lengthy period between arrest in Ohio and confession/arraignment in Pennsylvania (attributable, of course, to appellant's freely made decision to leave the state to avoid prosecution) *may* be a factor militating toward a finding of involuntariness, the suppression court had ample evidence to the contrary from which it could and did properly find that appellant's waiver of his right to remain silent and his confession were knowing, voluntary and intelligent, and not the product of any coercion that may be inherent in such a period of custody and transit. We are bound by the suppression court's fact findings and, finding no error in its legal conclusions, we affirm its determination that appellant's confession was voluntary.

In a related argument, appellant next asserts that the court erred in denying his motion to suppress his inculpatory statement as the product of an "unnecessary delay" between arrest and arraignment under Pa.R.Crim.P. Rule 130 and *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972), and under the *per se* "six-hour" rule enunciated by the Court in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977).

In *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), the defendants were arrested in Pittsburgh, given *Miranda* warnings, interrogated and arraigned on murder (and other) charges before an Allegheny County District Justice, and then transported to Greensburg where they were arraigned on murder (and other) charges in Westmoreland County some seven and one-half hours after their initial arrest in Pittsburgh. We then stated:

In *Davenport,* this Court adopted "a rule under which the admissibility of any statement taken while the accused is in custody before preliminary arraignment is based on the length of the delay between arrest and

arraignment." 471 Pa. at 286, 370 A.2d at 306. Although stated as mandatory and without any explicit exceptions, the rule that "[i]f the accused is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment *shall* not be admissible at trial," *Id.* (emphasis added), admits of an implicit exception "[S]ix hours provides a workable rule which can be readily complied with *in the absence of exigent circumstances." Id.,* n. 7 (emphasis added)). Although the continuing vitality of the *Davenport* rule as a whole is subject to speculation after [several recent decisions of this Court], it is clear that a majority of this Court has recognized the implicit "exigent circumstances qualification." *Commonwealth v. Keasley,* 501 Pa. 461, 462 A.2d 216 (1983); *Commonwealth v. Jenkins,* 500 Pa. at 150, 454 A.2d at 1007 (1982).

... If we are to require that arraignment take place in the county in which jurisdiction for the crimes charged lies, *it would be the height of folly to ignore the temporal and spatial realities which attend circumstances such as these, where arrest and arraignment occur a substantial distance apart. Cf. Commonwealth v. Dreuitt,* 457 Pa. 345, 321 A.2d 614 (1974) (time necessary to transport defendant from place of arrest [Baltimore, MD] to Philadelphia not considered as part of unnecessary delay between arrest and arraignment, where defendant was advised of right to counsel and of charges against him at place of arrest) (O'Brien, J., announcing Opinion of the Court, joined by Eagen and Pomeroy, JJ.). 502 Pa. at 490–91, 467 A.2d at 296 (emphasis added).

■ Obviously, in the case before us, exigent circumstances existed to excuse any requirement to arraign appellant in Philadelphia within six hours of his arrest in Newton Falls, Ohio, where he had fled to avoid prosecution. The Philadelphia police officers acted diligently and quite reasonably in transporting appellant to Philadelphia with appropriate dispatch, and we refuse to charge any of that transportation time against the Commonwealth in determin-

ing whether there was unnecessary delay between arrest and arraignment. Whatever validity the *Davenport* rule retains, its "six-hour clock" does not begin to run in such circumstances until the defendant has been returned to the judicial district wherein the arrest warrant was issued. As noted in *Commonwealth v. Blady*, 492 Pa. 285, 287, 424 A.2d 864 (1981), "This Court should throw away the stopwatch and pick up the scales of justice." (Larsen, J., dissenting, joined by Flaherty, J.) Appellant crossed the Philadelphia County line at 1:40 p.m. and was arraigned at 7:33 p.m. the same evening. Accordingly, appellant was arraigned within six hours of his arrival in Philadelphia, and his confession was not elicited or admitted in violation of *Davenport*. *See Commonwealth v. Feighery*, 354 Pa.Super. 1, 510 A.2d 1248 (1986).

Appellant further argues that the delay at the police administration building (from 1:57 p.m. to 7:33 p.m.) was not needed to process him and was used solely to interrogate him in violation of *Commonwealth v. Futch, supra* and Pa.R.Crim.P. Rule 130 which provides that "the defendant shall be afforded a preliminary arraignment by the proper issuing authority *without unnecessary delay*." This reliance on Rule 130 is misplaced as that rule delineates the "Procedure in Court Cases Initiated by Arrest Without Warrant." The governing rule is, instead, Pa.R.Crim.P. Rule 123, "Procedure in Court Cases When Warrant of Arrest is Executed Outside Judicial District of Issuance." Rule 123 provides:

(a) When a defendant has been arrested in a court case, with a warrant, outside the judicial district where the warrant of arrest was issued, *the defendant shall be taken without unnecessary delay to the proper issuing authority in the judicial district of arrest for the purpose of posting bail, as permitted by law.*

(b) Such issuing authority shall advise the defendant of the right to post bail. . . .

\* \* \* \* \* \*

(d) When a defendant fails to post bail, the arresting person shall:

*　　*　　*　　*　　*　　*

(2) lodge the defendant in a suitable place of detention in the judicial district of arrest, and forthwith notify the proper issuing authority in the judicial district where the warrant was issued of the defendant's detention, and the place of such detention. Upon receipt of this notice, the issuing authority *shall, without unnecessary delay, cause the defendant to be brought to the judicial district where the warrant was issued for preliminary arraignment* by the proper issuing authority.

The Philadelphia police officers complied fully with Rule 123 and brought appellant for preliminary arraignment by the proper issuing authority. Appellant was arraigned in Ohio before the federal magistrate and informed not only of his right to post bail, but also of the charges against him, and of his rights to remain silent and to counsel. Appellant was also brought before an Ohio state judge and informed of his right to an extradition hearing. These proceedings before two judicial authorities in Ohio supplied appellant with the information that is required to be given at our preliminary arraignment, Pa.R.Crim.P. Rule 140, and thus provided appellant with the protections we deemed necessary in *Futch* and *Davenport* to ensure against confessions that were garnered as a product of unnecessary delay. As we stated in *Commonwealth v. Jenkins*, 500 Pa. 144, 149–50, 454 A.2d 1004 (1980), the "danger diminishes significantly when a citizen is brought swiftly before a neutral judicial authority."

■ Moreover, we do not agree with appellant's assessment of the time between arrival at the police station and arraignment as completely unnecessary and calculated only to elicit a confession because the decision to charge appellant had already been made. The record indicates that appellant was allowed to rest for about an hour after his trip before being given *Miranda* warnings and questioned. Although there was certainly enough information to charge

appellant with the murder of Anthony Bonaventura, appellant had not earlier confessed to the other murders and it seems unlikely, from the record before us, that the police officers had sufficient evidence to charge appellant with the murder of Anthony Petrone or of John Amato until appellant had confessed to those murders. We do not, therefore, deem the time between arrival in Philadelphia and arraignment to have been unnecessary.

For the foregoing reasons, we hold that appellant's confession was not obtained in violation of *Davenport*, nor was it the product of unnecessary delay between arrest (or arrival in Philadelphia) and arraignment. We affirm the suppression court's determination that appellant's confession could be introduced by the Commonwealth at trial.

Appellant next alleges that several instances of improper remarks and conduct of the prosecutor, either individually or in the aggregate, unduly biased the jury against him and resulted in an unfair trial. We disagree.

 It is well established that a prosecutor, just as a defense attorney, must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with "logical force and vigor." *Commonwealth v. Smith*, 490 Pa. 380, 387, 416 A.2d 986 (1980), *quoting Commonwealth v. Cronin*, 464 Pa. 138, 143, 346 A.2d 59, 62 (1975). Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony. *Commonwealth v. Fairbanks*, 453 Pa. 90, 306 A.2d 866 (1973); *Commonwealth v. Stevens*, 276 Pa.Super. 428, 419 A.2d 533 (1980). The prosecutor may always argue to the jury that the evidence establishes the defendant's guilt, *Commonwealth v. Capalla*, 322 Pa. 200, 185 A. 203 (1936) although a prosecutor may not offer his personal opinion as to the guilt of the accused either in argument or in testimony from the witness stand. *Commonwealth v. DiNicola*, 503 Pa. 90, 468 A.2d 1078 (1983); *Commonwealth v. Pfaff*, 477 Pa. 461, 384 A.2d 1179 (1978); *Commonwealth v. Cronin, supra.* Nor may he or she express a personal belief and opinion as to

the truth or falsity of evidence of defendant's guilt, including the credibility of a witness. *Commonwealth v. Kuebler*, 484 Pa. 358, 399 A.2d 116 (1979) (where defendant's version of events was branded a "big lie"); ABA Standards for Criminal Justice, Standards Relating to the Prosecution Function Section 5.8(b) (Approved Draft, 1971).

However, not every intemperate or uncalled for remark by the prosecutor requires a new trial. As we have stated many times:

> [C]omments by a prosecutor do not constitute reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Anderson, supra* at 501 Pa. [275, at] 282, 461 A.2d [208, at] 211 [1983]; *Commonwealth v. Upsher*, 497 Pa. 621, 627, 444 A.2d 90, 93 (1982).

*Commonwealth v. Carpenter*, 511 Pa. 429, 439, 515 A.2d 531 (1986); *Commonwealth v. D'Ambro*, 500 Pa. 303, 309–10, 456 A.2d 140 (1983). Furthermore, the prejudicial effect of the prosecutor's remarks must be evaluated in the context in which they occurred. *Commonwealth v. Carpenter, supra*, 511 Pa. at 439, 515 A.2d 531, *quoting Commonwealth v. Smith, supra*, 490 Pa. at 388, 416 A.2d at 989. As the United States Supreme Court has stated:

> The "consistent and repeated misrepresentation" of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions. Such arguments, like all closing arguments of counsel, are seldom constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a

prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

In applying these standards on appellate review, we have stated:

Whether this standard has been violated by the language of the district attorney is not in the first instance our decision to make. It is the duty of the trial judge to rule upon the comments; this Court is limited in its review to whether the trial court abused its discretion.

*Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968).

Before applying these standards to the specific allegations of prosecutorial misconduct, we shall put them in the overall context of this pitched adversarial trial, one which the trial court characterized as hard, but fairly, contested. The trial was replete with instances where both the defense attorney, Mr. Robert Mozenter, and the assistant district attorney, Ms. Barbara Christie, approached and occasionally exceeded the boundaries of overzealousness, causing numerous admonitions to both by the court. *See, e.g.,* N.T. Trial February 4, 1983 at 95–96; N.T. Trial, February 3, 1983 at 114–119. These admonitions by the Honorable George J. Ivins were often followed by instructions to the jury reminding them that exchanges between counsel and improper comments by counsel were not to influence their deliberations, and explaining to the jury that the exchanges, comments and admonitions were normal, although undesirable, "heat-of-battle" incidents of the adversary system. The court maintained control, however, and, in fact, praised the conduct of the trial as one which "proved the validity of the adversary system" that was presented by two "adversaries in the finest tradition." N.T. Sentencing Hearing, February 9, 1983 at 51. These observations by the trial court support those made by Chief Justice Burger in *Unit-*

*ed States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985), wherein he states for the Court:

> [Our] standards reflect a consensus of the profession that the courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). It should come as no surprise that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Dunlop v. United States*, 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897).
>
> \*　\*　\*　\*　\*　\*
>
> Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

We now address appellant's specific averments of prosecutorial misconduct in light of the above principles. Appellant argues: "First, the prosecutor blatantly told the jury that the Commonwealth possessed other evidence which would have incriminated appellant, but had been precluded from doing so." Brief for Appellant at 50. The "other evidence" references were made by the prosecutor during closing argument when the following occurred:

> MS. CHRISTIE: And, ladies and gentlemen, to digress another moment, do you recall William Boyle on the stand? Do you recall William Boyle being asked why didn't he name Joseph D'Amato as the person that he gave that gun to? When worried, he called the police and filed a police report that that gun was missing. Do you recall him being asked that question a couple times? And do you recall him trying to answer that question based on what he knew or what he heard about the defendant? And do you recall an objection being sustained? And he couldn't tell you. So he broke it down—

MR. MOZENTER: That's objected to. That's objected to.

MS. CHRISTIE: —in that he was concerned—

THE COURT: Miss Christie—

MS. CHRISTIE: Yes, sir.

THE COURT: —the objection was sustained.

MS. CHRISTIE: Yes, sir.

THE COURT: It is not a matter to be discussed at this time. The ladies and gentlemen of the jury will disregard that comment.

\* \* \* \* \* \*

MS. CHRISTIE: Further, on 4/14/81, to get a search and seizure warrant for a car that just happened to be a 1979 Oldsmobile Cutlass, yellow, two-door coupe, and happened to be registered to the defendant's girl friend, Bernadette McFarland, and police on 4/14/81, they got a search and seizure warrant for that car, judicially authorizing them to impound it, photograph it, and examine it at the police garage, and we tried to tell you the results of that examination.

MR. MOZENTER: Objected to and move to strike.

THE COURT: Sustained.

MS. CHRISTIE: No knee-jerk reaction here.

THE COURT: Ladies and gentlemen, there is, once again, some allusion to something that was deemed not properly presented. You will disregard the last comment of the district attorney.

N.T. Trial, February 7, 1983 at 54–55, 58–59.

██ Appellant is correct that the prosecutor's references to "evidence" that the Commonwealth was not permitted to introduce were improper, and we disapprove of those comments. However, we do not believe that these references warrant reversal of appellant's convictions. Defense counsel objected to both comments and the court gave immediate cautionary instructions to the jury in each instance. As to the comment about William Boyle, whose testimony corroborated appellant's inculpatory statement that he used

a .38 caliber Derringer, defense counsel went to great and improper lengths to discredit Mr. Boyle's testimony. Counsel told the jury that "This guy was half-shot when he got on the witness stand," and that "This guy is an out-and-out liar. He either lied to you on the stand under oath, or he lied to the police officers who took his statement ... He's not worthy of ... your consideration." N.T., *id.* at 28–29. Counsel further argued that Boyle's testimony (that he lent appellant a gun and then reported it stolen hours later) was inherently unbelievable. The prosecutor's reference to what Boyle "couldn't tell" the jury was made in an attempt to rehabilitate the testimony of the witness who defense counsel had called an "out-and-out liar" who "would lie under oath as well," by suggesting that there were reasons for Boyle's actions on March 19, 1981. *Id.* In that context, and in light of the court's immediate cautionary instruction, we do not believe that the unavoidable effect of the prosecutor's comments was to prejudice the jury or to cause fixed bias or hostility toward appellant.

 The references to the examination of Ms. McFarland's car and to attempts by the prosecutor "to tell you the results of that examination" were also non-influential in the jury's deliberations. Presumably, the examination would have revealed that the undercarriage of Ms. McFarland's car had been damaged by scraping, thus corroborating the testimony of the witness who heard a scraping sound on March 19, 1981 at the scene of the shooting. This reference was completely innocuous, however, in light of the abundant evidence, including appellant's own statement, placing Ms. McFarland's car at the scene. Moreover, defense counsel had made the misleading comment in his closing that "no identification of any car was ever submitted in this case. Nothing," suggesting that the Commonwealth had no evidence linking the car to the murder. This was not the case. While we admonish Ms. Christie for countering this misleading statement with a reference to an examination of the car that had been ruled inadmissible, it is clear that the reference was an invited response and was innocuous, given

that the car had been positively linked to the scene and the murder from other sources. We do not believe that the jury was biased or appellant prejudiced by these comments, especially in light of the court's immediate and adequate cautionary instruction.

The other instances of prosecutorial misconduct were made without objection by defense counsel. Appellant claims, through his new appellate counsel, that his trial counsel was ineffective in failing to object and/or request a mistrial following each instance of alleged misconduct. We find no ineffectiveness in this regard.

■ Of course, where no objection has been made to the allegedly improper comments, the trial court has been deprived of its opportunity to rule upon the propriety of the comments and to render cautionary instructions to cure any potentially prejudicial impact. *Commonwealth v. Brinkley*, 505 Pa. 442, 455, 480 A.2d 980 (1984). The reviewing court must therefore assess counsel's performance in failing to make objection or request other relief by applying our usual standards for gauging the effectiveness of counsel's representation, namely whether the objection or request would have had arguable merit, if so whether counsel had any reasonable basis designed to further his client's interests and whether the omission or commission by counsel could have prejudiced the defendant. *Id.; Commonwealth v. Griffin*, 511 Pa. 553, 556–57, 515 A.2d 865 (1986); *Commonwealth v. Christy*, 511 Pa. 490, 496–97, 515 A.2d 832 (1986).

Appellant argues that trial counsel was ineffective in failing to request a mistrial following the prosecutor's references to evidence not of record, i.e. the references to what William Boyle might have said and to the examination of Ms. McFarland's car. In light of our determinations that these comments, coupled with the court's immediate instructions to the jury, did not prejudice appellant, a request for a mistrial would have had no arguable merit.

Appellant also asserts ineffectiveness of counsel in failing to object to the following comments of the prosecutor during closing argument:

Who's making the decision to speak, what to speak and how much to speak here? The police, if they've got such an ax to grind, if they want to get this defendant locked up so badly, not only is Kelly going to forget what he heard, but the other witnesses are going to forget what they heard, or if you can't get him to do all that, if Chitwood is such a great hostage-talker, and Chitwood is such a great statement-composer, why didn't he put Al in that statement in the exercise of your reason, logic and common sense? *Because he put down what the defendant chose to tell him.* Even though, as I recall it—what was it, Page 5 of that statement?—defendant slipped up a bit. Because when he got to that bridge, he's rolling down the passenger's side of the car window and chucking that gun out of the passenger's side into the river. If it was the driver, who's the other person? *Defendant didn't choose to tell us.* And while it makes no difference in the law, because accomplices are equally guilty as the person who actually shoots the victim, *this code of silence,* this choice that the defendant made up to and including the date of his arrest and his statement shows who's in control here, who's smart and who's not smart. Who's making decisions and who isn't?

Before you sits this defendant, Joseph D'Amato, in control on 12/8/81, 12/9, 12/10, just as he's in control on March the 19th, 1981, *a still clever, calculating and cunning executioner,* but a guy who, for whatever reasons of his own, ladies and gentlemen, although he sits here before you today, with all the pressure that he chooses to foist upon you that the police were trying to make him say things, *told the police what he chose to tell them.*

And it's interesting, ladies and gentlemen, *sometimes a code of silence,* and sometime people who join that pact, *a code of silence,* that's why there's no statute of limitations on a murder for accomplices, because sometimes

after conviction a co-defendant breaks from those who joined its pact. But what do we know now, ladies and gentlemen, on the reasonable, logical and credible evidence in the case; the chooser is sitting right here in front of you.

N.T. Trial, February 7, 1983 at 88–90 (emphasis added).

■ Appellant first suggests that the highlighted portions of the prosecutor's summation amount to an adverse inference on the appellant's decision not to testify at trial. Again, appellant pulls the prosecutor's statements out of context. The prosecutor's comments as to what appellant chose to tell the jury were specifically directed at what he told the police officers "through December of '81" and were made in response to defense counsel's vigorous attempts to discredit the appellant's confession by pointing out "inconsistencies" between the confession (e.g., appellant was alone) and testimony of witnesses (e.g., two males in the "getaway" car). Counsel's comments were merely an attempt to place the responsibility for that discrepancy on appellant, whose confession in December of 1981 related only as much of the incident as appellant chose to relate. And the prosecutor's comments on the "code of silence" were a legitimate attempt to suggest that the reason for the discrepancy, which defense counsel vigorously "played up" to the jury, was that he may have been protecting someone. Defense counsel would not have had a legitimate basis to lodge an objection to these comments, which did not raise an adverse inference on appellant's right to remain silent at trial. *See Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam opinion holding "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.") We also note that the court's instruction to the jury emphasized appellant's "absolute right" to remain silent during his trial.

■ Appellant also objects to the prosecutor's characterizations of him as a "clever, calculating and cunning execu-

tioner." The prosecutor may have used poor judgment in referring to appellant as an "executioner," but we cannot find, under the circumstances and in the context, that these comments unavoidably biased and prejudiced the appellant so that the jury could not weigh the evidence properly and render a true verdict, and we fail to see how appellant could have been prejudiced thereby. These comments were made in response to the defense portrayal of appellant as an uneducated and ignorant man who was duped and psychologically coerced into rendering the confession, and who could not have voluntarily waived his *Miranda* rights. Defense counsel stressed appellant's lack of education and his difficulty with reading and writing. He also suggested that the police officers were sophisticated interrogators with psychological expertise who "extracted" a confession from appellant with threats of prosecuting appellant's family for aiding and abetting his escape. N.T. Trial, February 7, 1983 at 19, 34–42. It was in this light that the prosecutor offered her comments about appellant being a man in control, a "clever, calculating and cunning executioner," who had not been duped into making a confession against his will. The prosecutor's use of the term "executioner" was unfortunate, but we cannot say the unavoidable effect of this isolated characterization was to prejudice appellant. *See Commonwealth v. Van Cliff,* 483 Pa. 576, 397 A.2d 1173 (1979) *and Commonwealth v. Anderson, supra.* Appellant's attorney was not, therefore, ineffective for failing to object to these comments by the prosecutor during closing argument.

■ Finally, appellant claims counsel was ineffective in failing to object to the following portions of the closing argument:

Is this defendant really the dumbo *that defense foists upon you* or is he cunning, calculating and canivingly [sic] cruel, with a hardness of heart, evil purpose, recklessness of consequences, indifference to the value of human life?

\* \* \* \* \* \*

Ladies and gentlemen, don't be gentle. Be just. Move forward on the evidence and on the law to what that evidence and the law undeviatingly demands, a verdict of guilty of first-degree murder. And in doing that don't be spun into the *web of deceit and self-contradiction that you're offered here by the defense,* because that's what this defendant offered to others; to Deborah Slattery, even to Bernadette McFarland, even to us; similar to a Dr. Jeykyl-Mr. Hyde personality that took vengeance at his own whim when others crossed him, or he felt that others did, and then used people to hide and to protect and to shield and to lie for him.

N.T. Trial, February 7, 1983 at 73–75. (emphasis added) These comments were given in response to improper remarks of the defense attorney regarding the Commonwealth's case and the credibility of its witnesses, N.T. *id.* at 28–29, and to suggestions that the appellant's confession might have been fabricated and/or embellished by the interrogating officers, N.T. *id.* at 36–41. Viewed in that context, these comments did not have the unavoidable effect of prejudicing or biasing the jury against appellant or unduly influencing its deliberations, and we decline to find counsel ineffective for failing to raise an objection to these remarks. *See, e.g. Commonwealth v. Brown,* 490 Pa. 560, 417 A.2d 181 (1980).

The various asserted instances of prosecutorial misconduct did not, either individually or in the aggregate, prejudice appellant nor unavoidably bias the jury or render it hostile toward appellant, and counsel's failure to object to these various comments did not deprive appellant of the effective assistance of counsel. Before we leave the subject matter of prosecutorial misconduct, we note that, while Ms. Christie's conduct and arguments did not rise to the level that would unduly prejudice appellant or deprive him of a fair trial, we are troubled by some of her remarks and comments, particularly the references to "evidence" that had not been introduced due to adverse rulings of the court and to the "executioner" remark. As an officer of the

court and an instrument of the criminal justice system, the prosecutor's duty is to seek justice, not simply convictions. The prosecutor's conduct at trial must be tempered by this dual responsibility. We will not hesitate, in appropriate cases, to refer matters of improper trial conduct of *either* the defense attorney or the prosecutor to the disciplinary board where the record suggests that the Code of Professional Responsibility may have been transgressed. *See Commonwealth v. Stoyko,* 504 Pa. 455, 472–73 n. 7, 475 A.2d 714 (1984) ("this Court will scrutinize the record for bogus "ineffectiveness tactics" [on the part of defense counsel] and should not hesitate, if the facts and inferences so warrant, to refer the matter to the disciplinary board.")

We affirm appellant's conviction of murder of the first degree and we turn our attention to review of his judgment of sentence of death as established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Reviewing the record of the trial and sentencing proceedings, we find the evidence sufficient to establish, beyond a reasonable doubt, the aggravating circumstance

that appellant had been convicted of another offense, the murder of John Amato, for which a sentence of life imprisonment had been imposed. 42 Pa.C.S.A. § 9711(d)(10) (*see* note 4, *supra*). We also have scrutinized the record and find that the sentence of death was the product of the evidence and not of "passion, prejudice or any other arbitrary factor," and that the sentence is not excessive or disproportionate to that imposed in similar (i.e., aggravating circumstance (d)(10) with no mitigating circumstances) cases.[6]

For the foregoing reasons, we sustain the conviction of murder of the first degree and affirm the sentence of death.[7]

ZAPPALA, J., did not participate in the consideration or decision in this case.

---

6. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts pursuant to this Court's directive in *Commonwealth v. Frey*, 504 Pa. 428, 442, 475 A.2d 700, 707–08 (1984), *cert. denied* 469 U.S. 936, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

7. The prothonotary of the Eastern District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S.A. § 9711(i).