J-A04001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
NAFEE ANTHONY DAVIS :
:
Appellant : No. 352 MDA 2024

Appeal from the Judgment of Sentence Entered February 5, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0001621-2021

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED SEPTEMBER 16, 2025**

Nafee Anthony Davis appeals from the judgment of sentence, entered in the Court of Common Pleas of Dauphin County, following his convictions of possession of firearm prohibited,[1] possession with intent to deliver a controlled substance—marijuana,[2] and possession of drug paraphernalia.[3]  After careful review, we reverse, vacate Davis' sentences and convictions, and remand for a new trial.

---

[1] 18 Pa.C.S.A. § 6105(a)(1).

[2] 35 P.S. § 780-113(a)(30).

[3] *Id.* at § 780-113(a)(32).

The trial court previously set forth the factual history on this matter[4] as follows:

On March 22, 2021, members of the Pennsylvania Board of Probation and Parole [(PBPP)] and Dauphin County Adult Probation and Parole went to 1401 N. 15th Street in the City of Harrisburg for the purpose[] of conducting a parole/probation search. [Davis] began residing at that address in January 2021, and was presumably approved by state parole and/or county probation.[9] Prior to March 22, 2021, [PBPP] Agent Rob Gerrity (hereinafter "Agent Gerrity") and [Adult Probation and Parole Officer (APO)] [Rick] Anglemeyer visited [Davis] at his residence on at least six [] different occasions.

> [9] At the time of the search, [Davis] was serving house arrest and was required to remain at the approved residence. [At trial, the parties agreed to use the general term "law enforcement officers" to refer to the probation/parole officers so as not to alert the jury to Davis' status.]

Agent Gerrity's first [] visit to [Davis'] residence was on February 9, 2021. On direct-examination, Agent Gerrity testified that [Davis] was the only person at the residence on that date. However, during cross-examination, it was revealed that the state parole agents involved in this case did not turn over all of their notes of contacts to the Commonwealth, who then could not turn it over to [Davis]. As a result, this [c]ourt directed the state parole agents to provide the notes to both parties. Once the notes were provided, Agent Gerrity corrected his prior testimony and stated that there were three [] other occupants at the residence on February 9, 2021, but he did not record their names. Agent Gerrity was only in the living room, and the visit lasted approximately five [] to ten [] minutes.

The next day, February 10, 2021, APO Anglemeyer visited [Davis] at 1401 N. 15th Street for the first time. APO Anglemeyer testified that he observed marijuana and drug paraphernalia on the living room coffee table. [Davis] informed APO Anglemeyer that he had a medical marijuana card, and APO Anglemeyer counseled him on the proper use of medical marijuana. During the visit, [Davis]

---

[4] This Court previously adopted this factual summary. ***See Commonwealth v. Davis***, 304 A.3d 762 (Pa. Super. 2023) (Table).

consented to a search of his bedroom and vehicle, and there was no evidence of any violation(s). APO Anglemeyer testified that [Davis'] bedroom was on the second [] floor toward the rear of the house.

On February 16, 2021, Agent Gerrity visited [Davis] at his residence. [Davis] was the only person present at that time and the visit lasted approximately five [] to ten [] minutes. Similar to the previous visit, Agent Gerrity testified that he was only in the living room.

Agent Gerrity's next visit to [Davis'] residence was on March 1, 2021. On direct[ ]examination, Agent Gerrity testified that [Davis] was the only person present. However, after the notes were provided, Agent Gerrity corrected his testimony and stated that a cohabitant was also present, but he did not record their name. Similar to previous visits, this visit lasted approximately five [] to ten [] minutes in the living room.

Two days later, on March 3, 2021, APO Anglemeyer visited [Davis] at his residence. APO Anglemeyer testified that he spoke to [Davis] at the front door and does not believe he went inside the residence that day.

Agent Gerrity's last visit before the search was on March 8, 2021. [Davis] was the only person present, and the visit lasted approximately five [] to ten [] minutes in the living room. On cross-examination, Agent Gerrity stated that his note said, "no other members of the household were present."

On March 22, 2021, Agent Gerrity, APO Anglemeyer, [PBPP] Agent Caleb Tyson (hereinafter "Agent Tyson"), and Dauphin County Adult Probation and Parole Officer Brandon Rigel (hereinafter "APO Rigel") knocked on the door of 1401 N. 15th Street at around 9:40 A.M., and there was no response for approximately three [] to four [] minutes. When [Davis] opened the door, officers immediately smelled the odor of marijuana, and observed a grinder and a marijuana blunt in plain view. [Davis] was immediately detained and remained with Agent Gerrity while Agent Tyson, APO Anglemeyer[,] and APO Rigel performed a protective sweep of the residence for safety purposes, prior to conducting the planned search. No other individuals were in the residence at that time.

The residence at 1401 N. 15th Street is a two-story row home with a finished basement, connected only on one [] side to another row home. In the basement, there was an in-home recording

studio in the common area, and a separate bedroom. During the protective sweep, officers observed a jar of medical marijuana on the desk of the recording studio, suitcases in the open closet, and three [] firearms [lying] on the floor in the basement bedroom in plain view. While officers were still at the residence, [Kyle] Oliver approached APO Anglemeyer and requested permission to enter. APO Anglemeyer denied him permission to enter. [] Oliver then informed APO Anglemeyer that he resided in the basement bedroom. There was an exterior door that led from the basement to the rear of the residence, where [Davis'] vehicle was parked. APO Anglemeyer did not know whether [Davis] had a valid driver's license or not.

The first floor consisted of the kitchen and living room. [No contraband] was found in the kitchen. As previously stated, officers observed a marijuana grinder, a blunt wrapper, and an ashtray in plain view on the living room table. During the protective sweep, officers removed all the items from the closet by the front door and searched through a pink backpack, as well as a box that was in the closet. Inside the pink backpack was a plastic grocery bag filled with what appeared to be drug packaging materials. The box was located on the top shelf of the closet that contained a composit[ion] notebook, a firearm, a digital scale box, and a guilty plea colloquy for an individual known as William Davis.[12] The composit[ion] notebook contained numerous writings in various handwritings. There was no attempt to obtain a handwriting exemplar to investigate the various handwritings found in the notebook. None of [Davis'] personal belongings were found in the living room closet.

[12] William Davis has no relation to [the defendant].

On the second floor, there were three [] bedrooms—front, rear, and north—and a bathroom. During the protective sweep of the second [] floor, officers observed a box of 9mm ammunition on a side night table in the front bedroom, consistent with the Glock 9mm found in the living room closet. While officers were still [at the] scene, [] Oliver handed his phone to APO Anglemeyer to speak with a female on the other end. The female identified herself as Melina Mendoza [] and informed APO Anglemeyer that she resided in the second-floor front bedroom, and legally owned a firearm (the Glock 9mm) that would be found in the living room closet.

As a result of the evidence observed in plain view, as well as evidence that was secreted in a bookbag and a box in the living room closet, APO Anglemeyer contacted Officer Jeremy Crist [] of the City of Harrisburg Bureau of Police. Officer Crist arrived on scene and was provided information by APO Anglemeyer. Based on the information provided to him, Officer Crist applied for four [] separate search warrants [for]: (1) the common areas; (2) the basement bedroom[,] which [was] identified [as belonging to] Oliver[;] (3) [the] second[-]floor front bedroom (belonging to [] Mendoza); and (4) [the] second[-]floor rear bedroom[,] which [was] identified [as belonging to Davis].

[The search of 1401 N. 15th Street yielded an abundance of evidence of marijuana trafficking. In the basement bedroom, identified as belonging to Oliver, the search uncovered, *inter alia*: three one-pound bags of marijuana, multiple firearms, ammunition, and $1,396.00 in cash. In the basement common area, the search uncovered, *inter alia*: Davis' expired identification card, two medical marijuana containers, a grinder, rolling papers, and luggage containing plastic bags with marijuana residue. The living room closet contained, *inter alia*: a backpack containing drug packaging materials, a shoebox containing a digital scale, a composition notebook, a firearm, and a backpack containing $2,000.00 [in cash]. Recovered in plain view in the living room was a marijuana grinder on a coffee table. The "futon room" on the second floor contained a grinder with marijuana residue and vacuum sealed bags with marijuana residue. In the second-floor-front bedroom, purportedly belonging to Mendoza, the search uncovered, *inter alia*: ammunition, a composition book containing a drug ledger, seven amphetamine pills, a total of $65,000.00 in cash, and labels used to package marijuana. Nothing was recovered from Davis' bedroom.]

Detective John Goshert [] testified on behalf of the Commonwealth as an expert in street[-]level drug trafficking. He opined that the marijuana recovered from 1401 N. 15th Street was possessed with the intent to distribute it. However, Detective Goshert also testified that[,] based on the evidence he reviewed, it appeared that the marijuana was being sold by the pound[,] as opposed to the typical street-level dealing where it[ is] sold by the gram. He further opined that it was a "very sophisticated operation" and likely involved more than one [] person.

Officers recovered a total of five [] firearms from [] Oliver's basement bedroom: (1) a 9mm pistol inside a backpack; (2) a

semiautomatic shotgun (Citadel) on the floor; (3) a bolt-action rifle (Creedmoor) on the floor; (4) a semiautomatic AR-15 on the floor; and (5) a Mossberg shotgun in a case behind the TV. During the investigation, Officer Crist was informed by [] Oliver that Jlynn McDonald [] was his girlfriend. Two [] of the firearms recovered from the basement bedroom were registered to [] McDonald—the 9mm pistol and bolt-action rifle. Inside the backpack with the 9mm pistol were medical records and a prescription bottle for [] McDonald.

Additionally, [] Oliver claimed ownership of the remaining three [] firearms recovered from his bedroom, and informed Officer Crist that he purchased the Citadel shotgun and the AR-15. An additional firearm was recovered from the living room closet—a 9mm pistol registered to [] Mendoza. [] Oliver was charged with possession of the marijuana found in his basement bedroom, but [] McDonald was not. Significantly, there was no evidence with [Davis'] name on it [] recovered from [] Oliver's bedroom.

In the basement studio, officers recovered [Davis'] expired identification card, as well as two [] medical marijuana containers. Despite the medical marijuana containers having labels with identifying information on them, apparently Officer Crist chose not to investigate [the identity of the patient].

The only evidence in the second [] floor front bedroom ([identified as] Mendoza's bedroom) that had [Davis'] name on it was a Dauphin County Treasury bill addressed to [Davis] and Charles Morrison [] for a property at 18 Evergreen Street. The bill was mailed to 929 Norwood Street. During the investigation, Officer Crist learned that [] Morrison is [Davis'] adopted brother, and that they jointly own the property at 18 Evergreen Street. Officer Crist did not check the Recorder of Deeds to obtain a copy of the deed for 18 Evergreen Street. At trial, Officer Crist was shown a copy of the deed and indicated that it was a quit claim deed—a brother[-]to[-]brother transfer from Joseph Davis to [] Morrison and [Davis].

Officers also recovered the identification card and [S]ocial [S]ecurity card for Katiria Maldonado-Davila [] in the second [] floor front bedroom ([]Mendoza's bedroom). During the investigation, Officer Crist learned that [] Maldonado-Davila was [Morrison's] girlfriend[.] However, Officer Crist did not interview [] Morrison or [] Maldonado-Davila during the investigation to find out why her personal information was in [] Mendoza's bedroom.

Further, there was no evidence with [Davis'] name on it recovered from the second [] floor north bedroom (["]futon room["]).

Of all the evidence that was collected—six [] firearms, numerous plastic bags, storage containers, ammunition boxes, notebooks, packaging labels, etc.—only the [two] 9mm pistols were processed for fingerprinting. No latent prints were found. Officer Crist explained that he did submit the other four [] firearms for fingerprinting, but there was a "packaging snafu" that made the firearms unable to be processed.

Although Officer Crist had the capability to collect trace DNA from the firearms for analysis, he chose not to do so. He explained that he did not request them to be processed because: (1) it would not have be uncommon for [Davis'] DNA to be on the firearms since he resided at 1401 N. 15th Street; (2) the Pennsylvania State Police lab would not prioritize the testing because it was not a homicide or aggravated assault; and (3) it "doesn't seem logical for the possibility for there to be actual reason for his DNA to be on the weapons."

Despite Officer Crist having evidence that at least six [] and possibly up to nine [] other individuals had access to 1401 N. 15th Street—[] Oliver, [] Mendoza, [] Morrison, [] Maldonado-Davila, [] McDonald, [] William Davis, the three [] unnamed occupants at the residence on February 9, 2021, and the unnamed cohabitant at the residence on March 1, 2021—he chose to only interview [] Oliver and [] Mendoza, and did not investigate any of the other individuals to determine what level of access they may have had to the residence.

At some point during the protective sweep or ultimate search, officers obtained possession of [Davis'] key[ ]ring and discovered that one [] of his keys opened the back door of the residence. That same key was not examined to see if it also opened the front door, nor was it collected as evidence. Additionally, four [] to five [] other sets of keys were photographed throughout the residence, but were not seized []or tested to see if they opened the front and/or back doors. Further, the only evidence testified to [as being] in [Davis'] bedroom w[as] a vape pen and loose marijuana, which were not collected as evidence.

Trial Court Opinion, 1/12/23, at 4-15 (citations to record and some footnotes omitted).

On September 20, 2021, Davis filed an omnibus pretrial motion to suppress, in which he argued: (1) parole officers lacked requisite reasonable suspicion to conduct a search of Davis' residence; (2) the text message authorization was inadequate to establish prior approval of a supervisor to conduct a property search; and, (3) the property search was not a protective sweep. **See** Omnibus Pre-Trial Motion to Suppress, 9/20/21, at 1-7. On December 13, 2021, the trial court conducted a hearing, after which the parties filed briefs and proposed findings of fact and conclusions of law. On April 7, 2022, the trial court denied Davis' motion.

On September 15, 2022, the Commonwealth filed a motion in limine and sought to preclude its own officers, APO Anglemeyer and Officer Crist, from testifying about the statements made by Oliver, Anthony Smith,[5] and Mendoza during their respective interviews. **See** Commonwealth's Motion in Limine, 9/15/22, at 1-3 (unpaginated). In particular, the Commonwealth sought to prohibit its officers from testifying that Smith had informed the officers that the basement bedroom was occupied by Oliver, the second floor front bedroom was occupied by Mendoza, and the second floor side bedroom was occupied by Davis. **See id.** at 2. Additionally, the Commonwealth sought to exclude from evidence Oliver's statements to Officer Crist that Oliver lived in the basement bedroom, had one pound of marijuana in his bedroom, had three firearms in his bedroom that belonged to him, and that he was unaware

_____

[5] Smith was the property manager of 1401 N. 15th Street.

- 8 -

of any other firearms or controlled substances in the residence. *See id.* The Commonwealth argued that these statements were inadmissible hearsay and requested that its officers and defense counsel be prohibited from presenting these statements to the jury. *See id.* at 2-3.

On September 19, 2022, immediately prior to trial, the trial court conducted a hearing on the Commonwealth's motion in limine. *See* N.T. Jury Trial, 9/19/22, at 6-29.[6] The Commonwealth revealed that Oliver, who had claimed ownership of the firearms and marijuana, had turned himself in to authorities, and the Commonwealth was unsure whether they would call him as a witness. *See id.* at 8. Similarly, Mendoza was also charged in relation to the above-described events and was represented by counsel. *See id.* at 11-12. The Commonwealth argued that it would be prejudiced by admission of Oliver's and Mendoza's statements made to APO Anglemeyer and Officer Crist due to their hearsay nature. *See id.* at 20-23. Ultimately, the trial court denied the Commonwealth's motion in limine. *See id.* at 29.

Davis proceeded to a jury trial on September 19-22, 2022. Relevant to the issues raised on appeal, throughout the jury trial the Commonwealth flagrantly ignored the trial court's orders and misrepresented the evidence to

---

[6] During the course of this hearing, the Commonwealth revealed that both Oliver and Mendoza had been charged in relation to the above-described events and that both had counsel. *See id.* at 8, 11. Additionally, the Commonwealth asserted that the witnesses were not unavailable for the purposes of hearsay and, thus, if Davis wanted to use their hearsay statements then Davis could call them to the stand. *See id.* at 16-23. However, the Commonwealth acknowledged that it was likely Oliver and Mendoza would both invoke their right against self-incrimination. *See id.*

the jury by arguing that Davis was the sole resident, and only person present at the home at all times. The Commonwealth's contemptuous behavior was best summarized by the trial court in a prior opinion as follows:

> It is disingenuous for the Commonwealth to argue the inference that [Davis] was the only person present at the residence, when it was aware that two (2) other individuals were also charged with constructively possessing the contraband found in the residence of 1401 N. 15th Street. In fact, the Commonwealth [filed] a motion in limine on September 15, 2022, at 8:15 A.M., a mere forty-five minutes (45) minutes before jury selection in this case, to prohibit its own witnesses (Officer Crist and APO Anglemeyer) from testifying as to the statements [] Oliver, [] Mendoza, and [] Smith made to them. The motion in limine was filed **after** this court denied the Commonwealth's request to introduce [Davis'] prior criminal record pursuant to Rule 404(b).[7] The statements made by [] Oliver and [] Mendoza were made part of the police report and were incorporated into the police investigation.
>
> Additionally, the Commonwealth sought to prohibit defense counsel from arguing that other people resided at the residence during [] opening statement[s]. Specifically, the Commonwealth objected to the presumption that the statements made by [] Oliver and [] Mendoza were true and argued that it would be prejudicial to the Commonwealth if defense counsel was allowed to argue that other people resided at 1401 N. 15th Street. The Commonwealth argued that the statements made to **law enforcement officers** were inadmissible hearsay and that [Davis] "cannot defend his case with hearsay through [its] officers."

---

[7] We note that the trial court and the parties have referenced the Commonwealth's Pa.R.E. 404(b) motion. **See** N.T. Jury Trial, 9/19/22, at 6. However, we are unable to locate it in the certified record before this Court. Based upon the references that exist in the record, it is clear that the Commonwealth filed a Rule 404(b) motion seeking to introduce Davis' criminal record including, but not limited to, the offense(s) for which he was on parole. Ultimately, the trial court denied that motion as it would have been unfairly prejudicial to Davis to introduce his prior record, which would include the offenses for which he was on parole.

During oral argument on the motion in limine, this [c]ourt learned that [] Oliver had turned himself in the day of jury selection in this matter and that he was subpoenaed by the Commonwealth. However, mere minutes before the trial began, the Commonwealth stated that it had not yet decided whether it would be calling [] Oliver as a witness and was unsure if he would exercise his Fifth Amendment right to remain silent. Even more frustrating, this [c]ourt learned that when [] Oliver turned himself in, the Commonwealth, along with Officer Crist, met with [] Oliver and his counsel for the purposes of a proffer. The proffer was not written, was not video or audio recorded, and Officer Crist did not write a supplemental report. Instead, the attorney for the Commonwealth in this case prepared a two-page summary of what the proffer was and provided that to defense counsel. [] Oliver's proffer appears to be consistent with this statements to APO Anglemeyer and Officer Crist.

The Commonwealth did agree that if [] Oliver was called as a witness by [Davis] and exercise[d] his Fifth Amendment right, he would be unavailable as a witness and the statements made to Officer Crist and APO Anglemeyer would then be admissible as hearsay with an exception. This [c]ourt ultimately denied the motion as the statements made to APO Anglemeyer and Officer Crist were admissible as hearsay with an exception—effect on [the] listener (explaining what investigative steps follow[ed] the statements).

Significantly, this [c]ourt admonished the Commonwealth for **repeatedly** emphasizing that [Davis] was the lone person at the residence each time law enforcement officers were present. The Commonwealth was well aware that [Davis] was **required to be in his approved parole address as he was on house arrest and electronic monitoring**, **information which would have been unduly prejudicial for the jury to hear**. By repeatedly exploiting the reality that [Davis] was unable to leave his residence, the Commonwealth placed [Davis] in an unfair position—violate his constitutional rights by informing the jury he was on state parole and required to be on house arrest or say nothing and allow the Commonwealth to argue that he had to be in control of the entire residence. In fact, the Commonwealth argued that [Davis] could have informed [the jury] that he was [on] parole as part of his defense. The Commonwealth repeatedly pushed the boundaries of this [c]ourt's ruling by having each

- 11 -

witness testify to the fact that [Davis] was the only person at the residence at each visit. The Commonwealth then argued to the jury[, in its closing,] that [Davis'] continued presence at the residence was tantamount to being designated guardian of the drugs and firearms.

Trial Court Opinion, 1/12/23, at 23-25 (citations and some emphasis omitted).[8]

On September 22, 2022, the jury convicted Davis of the above-mentioned offenses. After the verdict was announced, Davis moved for judgment of acquittal and, following briefing by both parties, the trial court granted Davis' motion on October 20, 2022, and dismissed the charges against him. The Commonwealth filed a timely appeal and this Court reversed, reinstated Davis' convictions, and remanded for sentencing. *See Davis*, *supra*.

Upon remand, the trial court sentenced Davis to an aggregate term of three to seven years' incarceration. Davis did not file a post-sentence motion. Davis filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Davis now raises the following issues for our review:

1. Whether the prosecution committed misconduct by repeatedly exploiting that Davis was unable to leave his residence (since he was on state parole/house arrest) and arguing that he had to be in control of the entire residence?

---

[8] Notably, the trial court was addressing a sufficiency of the evidence claim but provided the above summary in support of its conclusion regarding the inferences from the evidence. *See id.*

2. Whether the search of Davis' residence violated his Article I, § 8 and Fourth Amendment rights where:

a. The text message "authorization" was inadequate to establish prior approval of a supervisor to conduct a property search;

b. parole officers lacked reasonable suspicion to conduct a search of Davis' residence;

c. the protective sweep of Davis' residence was unconstitutional under Article I, § 8 and the Fourth Amendment.

3. Whether the trial court erred in declining to provide counsel's request for a ["]mere presence["] jury instruction, i.e., that mere presence at the scene of an alleged crime is insufficient to find a person guilty of the offenses charged herein?

Brief for Appellant, at 7 (reordered for ease of disposition).

In his first claim, Davis argues that the Commonwealth committed prosecutorial misconduct by repeatedly violating trial court orders and exploiting the fact that Davis, due to his house arrest and parole status, could not leave the house. *See* Brief for Appellant, at 35-37. Davis asserts that, throughout the case, the Commonwealth repeatedly asserted that Davis was the only person who lived in and had control over 1401 N. 15th Street. *See id.* Davis contends that the Commonwealth, in making these repeated claims, intentionally manipulated the evidence and defied the trial court's orders. *See id.* Davis points out that on multiple occasions the trial court either cautioned or directly ordered the Commonwealth not to make the assertion that Davis was the only person who lived in the house. *See id.* at 36-37. Davis argues that in the Commonwealth's opening and closing arguments, despite the trial

court's warnings, the Commonwealth represented that Davis was "the only person present" and "the only one in that house.  He was the only one there." *Id.* at 37.  Specifically, Davis request that this Court, in light of the Commonwealth's repeated misconduct, award him a new trial.  After review, we agree.

Our standard of review is as follows:

> It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion.  In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial.  A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.  It is also settled that a mistrial is not necessary where cautionary instructions are adequate to overcome any potential prejudice.  The law presumes that a jury will follow the trial court's instructions.

*Commonwealth v. Gilliam*, 249 A.3d 257, 274 (Pa. Super. 2021) (citations and quotation marks omitted).

It is well established that "a prosecutor . . . must have reasonable latitude in presenting a case to the jury and must be free to present his or her arguments with logical force and vigor."  *Commonwealth v. D'Amato*, 526 A.2d 300, 309 (Pa. 1987) (citations and quotation marks omitted).  "Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony."  *Id.*  Importantly, "not every intemperate or uncalled for remark by the prosecutor requires a new trial."

- 14 -

*Commonwealth v. Chmiel*, 777 A.2d 459, 466 (Pa. Super. 2001) (citation omitted). "[C]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Id.* (citation omitted). "Furthermore, the prejudicial effect of the prosecutor's remarks must be evaluated in the context in which they occurred." *Id.* (citing *D'Amato*, 526 A.2d at 309). Our standards reflect a consensus that a defendant is entitled to a fair trial, not a perfect one. *See Commonwealth v. Rayner*, 153 A.3d 1049, 1058 (Pa. Super. 2016). Finally, we note that the trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the trial court's decision will not be overturned absent an abuse of discretion. *See Commonwealth v. Rega*, 933 A.2d 997, 1016 (Pa. 2007).

We have already quoted the trial court's summary of the prosecution's behavior in this case.[9] *See* Trial Court Opinion, 1/12/23, at 23-25. Notably,

_____

[9] However, we note that in its most recent Rule 1925(a) opinion, the trial court did not address Davis' prosecutorial misconduct claim, but rather attached, and cited to, its January 12, 2023 Rule 1925(a) opinion. *See* Trial Court Opinion, 6/13/24, at 6 ("[I] reviewed the matter of the Commonwealth's awareness of [Davis'] presence on house [arrest] and electronic monitoring at his approved parole address and argument of the issue in the case. [I] incorporate that review and analysis herein[.]"). Confusingly, the trial court, despite repeatedly admonishing the Commonwealth for its behavior and mischaracterization of the evidence, as described throughout this memorandum, did not enter an express ruling on the prosecutorial misconduct

*(Footnote Continued Next Page)*

- 15 -

the trial court ruled, at the beginning of trial, that the Commonwealth could not prohibit its own officers from testifying regarding other people being present and living at 1401 N. 15th Street. *See* N.T. Jury Trial, 9/19/22, at 6-29; *id.* at 16-17, 22-23 (trial court expressing concerns that motion in limine was filed so close to trial and there was no time for proper hearing to develop record); *id.* at 25-29 (trial court denying motion in limine, cautioning parties about misrepresenting evidence that they cannot back up with evidence).

Nevertheless, in the prosecutor's opening statement he stated: "there was one person in the house when [law enforcement] arrived to conduct the search, [Davis]. You're also going to hear that the law enforcement officers had visited that house on some dates previously. **And every time—every time they visited, the only person present was [Davis].**" *Id.* at 46 (emphasis added).

The Commonwealth continued to push the boundaries of the trial court's rulings by repeatedly questioning APO Anglemeyer about the presence of others at the residence and repeatedly emphasizing that Davis was always present, **alone**. *See id.* at 66-69, 74, 79, 82-86 (prosecutor questioning APO Anglemeyer regarding presence of other people at 1401 N. 15th Street). However, on cross-examination, APO Anglemeyer admitted that Oliver was present. *See id.* at 117-18 (APO Anglemeyer testifying he saw Oliver and

---

claim. However, in light of the fact that Davis was convicted and sentenced, we conclude that the trial court denied Davis' claim despite not doing so overtly and on the record.

spoke with him at 1401 N. 15th Street). Further, during cross-examination, defense counsel sought to question APO Anglemeyer about whether Mendoza had called and spoken with him during the search of 1401 N. 15th Street. *See id.* at 121-22, 126-28. The Commonwealth objected on the basis of hearsay and the following exchange occurred:

[Defense Counsel]: The [caller identified herself to APO] Anglemeyer . . . as Melina Mendoza. She provided a date of birth of 3/27/97. She was told that I cannot comment on an active investigation. She stated that she was the residen[t] of the second-floor-front bedroom and that she was also the owner of a Glock handgun.

* * *

Court: In the subsequent police investigation, do they confirm the date of birth of [Mendoza]?

[Prosecutor]: Yes. Yes. And that date of birth could've been known to anyone who could've made that call.

Court: As an Officer of the Court, are you telling me that the person on the phone was not [] Mendoza?

[Prosecutor]: [I'm] telling you that I have no evidence that it was [] Mendoza.

[Defense Counsel]: As you correctly noted in your pretrial motion, this evidence was relied upon by the police in the course of their investigation, this evidence—is being offered to prove what the officer did as a part of their investigation. It is a continuous course of conduct.

* * *

[Prosecutor]: Judge, if I may, this argument by the defense is [specious]. They have no[] interest in showing why the police did what they did. The only cause for this, and it will be clear in their closing argument[,] is to try to argue that [Davis] had other

- 17 -

people living with him.  It's coming in for [its] truth.  There's no foundation for the exception rule.

Court:  Are you aware of what else—is there stuff found in the room that corresponded with [] Mendoza?

[Prosecutor]:  **There are physical items that have [Mendoza's] name on them, yeah.**

Court:  **In the room in question?**

[Prosecutor]:  **Throughout the house.  I believe in that room as well.**

* * *

[Prosecutor]:  Judge, I can't cross-examine these people because I can't ask them if they have been there in the last month or last year.

Court:  **You can subpoena, and you call them in.  You carry the burden.  But then you can't sit there and say I'm not choosing to call someone and then basically say we have to leave the information outside.  Every[ ]one [] of those statements is potentially a statement against penal interest based on the items that are found in those respective rooms.**

*Id.* at 122-25 (emphasis added).[10]

Next, the Commonwealth questioned Agent Gerrity multiple times about the presence of other people at the residence during the searches.  ***See id.*** at 202-05 (Gerrity testifying he visited Davis at 1401 N. 15th Street six times).  The Commonwealth only asked Agent Gerrity whether Davis was present.

_____

[10] We note that, after this exchange, the Commonwealth contacted Mendoza's attorney, who drafted an affidavit explaining that if the Commonwealth subpoenaed Mendoza, she would invoke her right to remain silent.  ***See id.*** at 150-53.  As a result, the trial court declared Mendoza unavailable for the purposes of admitting any statements she made via the phone call to the police.  ***See id.***

- 18 -

However, on cross-examination, Agent Gerrity testified that he never saw anyone else at the residence. *See id.* at 213. Additionally, during cross-examination, it became apparent that Agent Gerrity's notes from all of his visits to 1401 N. 15th Street were not available to defense counsel. *See id.* at 222. As a result, the trial court ordered that Agent Gerrity remain on subpoena, be available for recall, and directed the Commonwealth to secure those notes in order for defense counsel to effectively cross-examine Agent Gerrity. *See id.* at 221-24. Ultimately, the notes in question were produced and Agent Gerrity testified that, on two separate occasions, other residents were present at 1401 N. 15th Street, despite his testimony to the contrary on direct examination. *See id.* at 227-32. On redirect, the Commonwealth insinuated that Agent Gerrity did not actually see other residents at the house but heard the same "from a source." *See id.* at 233-35 ("So do you have a recollection [] whether or not the[re] were actually three other people there, or that you were told that there were three other people there?"); *id.* ("So, from a source, you got information that there were three other occupants, whether you saw them yourself or whether you were told about it, correct?").

Next, the Commonwealth questioned Officer Crist, who testified that he located identification for Oliver in the basement bedroom. *See id.* at 261-62 (Oliver's expired identification and speeding ticket located in basement bedroom). Officer Crist also testified that he spoke with Oliver and that, through the course of the investigation, he discovered that Oliver lived in,

among other places,[11] 1401 N. 15th Street. *See id.* at 301-06. Officer Crist also testified regarding the four search warrants that police obtained. *See id.* at 317-18. In relevant part, we observe that each of the four search warrants identified **a different room of the house based upon which occupant lived there**. *See id.* at 319 (counsel summarizing that search warrants identified areas searched as: "common areas, [Davis]; basement bedroom, [] Oliver; . . . upstairs-rear-east-and-farthest-south bedroom, [] Davis" and "front-bedroom . . . unknown occupant"); *see also id.* at 350-54 (Officer Crist testifying about occupant identification on search warrants).

During an off-the-record discussion in the midst of Officer Crist's testimony, the following exchange occurred regarding Smith's availability and ability to testify:

> [Defense Counsel]: I have been informed that my investigator has been able to serve a subpoena on [] Smith, and he will be here in the morning. I am not confident that he's going to recollect the conversations [he had with] Officer Crist.
>
> Although, I have been told, and I don't know this because I've been in court all afternoon, that he doesn't dispute what is in the report prepared by [Officer] Crist. So[,] he may not recollect the names that he provided to [Officer Crist].
>
> Court: But if [he] comes in and doesn't recollect, and his recollection doesn't get refreshed, then you have your past recollection recorded.
>
> [Defense Counsel]: Right, with another witness.

---

[11] Officer Crist discovered that Oliver had a second listed address that is not relevant to this appeal. *See id.*

[Prosecutor]: Wait. That's the officer's past recollection recorded, not the witness'.

Court: But he's subject to cross-examination.

I understand the nuances. But for practical purposes, you can't just dance around the rules like that. You have to be able to get to the truth.

Do you think for one minute this officer took an inaccurate statement from [] Smith or relayed—

[Prosecutor]: No.

Court: —which he relied upon—

[Prosecutor]: No. Wait, wait, wait.

Court: —to get four separate warrants?

[Prosecutor]: But I have no reason to believe anything [] Smith says.

* * *

Court: [T]he jury is going to be able to evaluate [] Smith on how he answers, evades, or dances around the questions that are asked of him.

[Defense Counsel]: **I've been asking [the Commonwealth] for the identification information. You told me he was under subpoena. You told me that you mailed the subpoena. You did tell me, you've been trying to reach him. I had somebody [start looking for Smith at] 10:30 [a.m. this] morning [and t]hey met [] Smith, he accepted service of the subpoena, and will be—took off work tomorrow and is coming in at 8:30 [a.m.] tomorrow.**

* * *

**[I]n full transparency, I talked [to] him on the phone. [Smith] didn't run. He accepted service of the subpoena. I told him that there was an effort to try to alleviate his [need to] testi[fy], but it didn't seem likely to occur.**

- 21 -

*Id.* at 323-27 (emphasis added).

Following that exchange, cross-examination of Officer Crist resumed. Officer Crist testified that Mendoza, who had claimed ownership of the firearm found in the second-floor front bedroom, had a lawful Bill of Sale reflecting that she had purchased it. *See id.* at 334. Officer Crist also testified that the birth date provided by Mendoza on the Bill of Sale matched the birth date Mendoza had provided over the phone. *See id.* Further, Officer Crist explained that numerous people had identification or other indicia in the residence that would tend to indicate they had been in or lived in the residence. *See id.* at 340-42 (Officer Crist's testimony that Morrison, Maldonado-Davila, Mendoza, Oliver, and McDonald all either lived at 1401 N. 15th Street or had left behind identification). On re-direct examination, Officer Crist acknowledged that he did not discover any indicia of Davis in the basement bedroom, and he only found indicia of Oliver. *See id.* at 375.

Next, Smith testified for the defense. Smith testified that he did not hold himself out as the property manager, but that he took it upon himself to maintain the property on behalf of his aunt. *See id.* at 422-27, 430. Smith testified that he was also in charge of collecting rent for the property. *See id.* at 431. Smith explained that his aunt, who lived next door to 1401 N. 15th Street, was elderly and could not maintain the property on her own. *See id.* at 426. Smith stated that Oliver, Davis, and Mendoza lived at 1401 N. 15th Street. *See id.* at 427. Smith further stated that, based upon his recollection,

Maldonado-Davila, Morrison, and McDonald did not live at the residence. *See id.* at 428-29.

On cross-examination, the Commonwealth began questioning Smith about his potential connections to a drug operation, and defense counsel objected. *See id.* at 438. The trial court cautioned the Commonwealth that it would not permit the Commonwealth to essentially investigate a new lead on the stand in front of the jury and that it would not permit the Commonwealth to ask incriminating questions of Smith that might result in a mistrial in Davis' case. *See id.* at 441-57. After admonishing the Commonwealth for its line of questionings, the trial court permitted the Commonwealth to perform a "dress rehearsal" of its cross-examination of Smith to avoid incriminating questions. *See id.* Ultimately, the trial court was satisfied, and Smith was cross-examined before the jury. *See id.* at 457-463.

After the close of evidence and during the parties' discussions on jury instructions, defense counsel objected to the prosecutor's conduct and the prosecutor's request for an accomplice liability jury instruction,[12] and the following exchange occurred:

---

[12] Based upon our review of the record, defense counsel objected to both the prosecutor's conduct and the request for an accomplice liability jury instruction. It appears that this is where the confusion occurred and why there is no explicit order denying defense counsel's request.

*(Footnote Continued Next Page)*

Court: Where's the Commonwealth coming from on that?

[Prosecutor]: I think there's abundant circumstantial evidence that this is a collective enterprise. [Davis] is the only one who's ever seen at that residence every time law enforcement went there. It's his residence. All of it.

Court: **That's not the way the evidence came in when . . . the probation—there were other people in—**

[Prosecutor]: No. What I said, Judge, is [Davis is] the only one who was always there.

[Defense Counsel]: **Well, he had to be there. He was on house arrest. I didn't object in front of the jury because we talked about this issue.** To continue to infer that he was at the house—I tried to buffer it a bit with the one witness[] by saying you would've expected him to be there. Okay. But now, to say that my client is—was the only one present when the Commonwealth knows he was obligated to be present. He had GPS monitoring electronically attached to his ankle. His whereabouts were being monitored by probation. To allow [the prosecutor] to say that [Davis] was the only one present as if he's watching over the contraband—is improper argument.

[Prosecutor]: I think it's a perfectly appropriate argument, Judge, because that's exactly what the evidence is. It's the defendant who chose to live at a drug house.

Court: Let's pause. This was a delicate issue because the law enforcement officers, in the beginning, were essentially parole officers for State Parole. Now, fortunately, State Parole stayed out [of] it, as f[o]r the charge. But I don't think there's a juror here that hasn't probably figured out with the terminology used, with violations, and detention that—they probably kind of surmised that he's on that.

---

Moreover, we note that, on appeal, the Commonwealth has conceded that defense counsel objected and preserve this issue for our review. ***See*** Commonwealth's Brief, at 21 (conceding defense counsel preserved prosecutorial misconduct claim when also objecting to accomplice liability instruction).

But here's the problem, they don't know that he was on house arrest. And for you to argue that he's the only one there because he's required to be there, it doesn't allow the defense to come up with an explanation without letting the parole information out.

[Prosecutor]: Exactly. **That's their Hobson's choice. That's not our problem. That's not my problem.**

Court: **No. It is your problem**— . . . As an Officer of the Court that if you're going to draw[] an inference because he's compliant with the probation officer [and] that that's somehow evidence that he was the kingpin of this operation you've described.

[Prosecutor]: I'm not saying he was the kingpin, Judge. But Chief Goshert testified that people in an organization such as [one] evidenced by this would be specialized and would have different roles. He said some of them would be street dealers, some of them would be the procurers of the information, other ones might be money guys, and there would be people whose job would be security, to babysit the drugs—

Court: That doesn't mean they're all living in the same household. Everyone knows that a decent-size distributor is going to have runners, and toyees [*sic*], and all the other stuff they want[.] That doesn't mean they're living with them.

[Prosecutor]: No, no. But that also means that everyone knows that a drug operation of this nature is not going to have strangers coming in who have nothing to do with it.

Court: And all of that I understand. **The problem is you're basically going to make an argument that because he was the only one in the entire—every time that the probation officers came out**, and we're not going to say probation officers, **that he's got to obviously [be] in control of the premises when, in fact, he's there because he's on house arrest and it's impossible for that information to come out without committing a mistrial.**

**So why do you want to argue that he is the only person there every time when we know the reason is he was on supervision and under house arrest?**

[Prosecutor]: Because he's the only one, Judge, that we have competent evidence was even residing there.

Court: And that is the result of an investigation that the Commonwealth had full control over from the time of its inception until right up to today. You obviously have a working knowledge. You were able to pull out this exhibit with complete facility. You have full control and understanding [of] whats going on. **You've chosen what you put in, which is your prerogative, but then to argue that you can make out that he had dominion over everything because he was on house arrest, I'm saying that's the part of your argument that I'm—I'm going to actually forbid you from using that argument for those reasons.**

*Id.* at 468-71 (emphasis added). Immediately prior to the Commonwealth's

closing argument, the following exchange occurred:

[Prosecutor]: The second question, Judge. [Defense counsel] made reference repeatedly to prior visits by law enforcement to the house and emphasized on two or four occasions when [Agent] Gerrity went there that there were other people present. In light of him making that argument, after I was precluded from referencing the fact that the defendant was present on five occasions or six occasions when they went before to search, may I now argue that?

I[n] fact, you know, he was there. I'm not going to say he was the only one there. That's not what the evidence is. But he's walked into those prior visits, and I have—

Court: First of all, I never precluded [you] from saying he was there on a number of occasions. What I was precluding was you saying he was the only one there every time they were there.

[Defense Counsel]: He said always there every time they were. Always there, that's what you said.

[Prosecutor]: So[,] I'm permitted to argue that he was there every day because there was testimony about him being there.

Court: So . . . I just don't want an inference that, oh, because he was there every time, it's his house and his house alone because

- 26 -

he had to be there when he was under house arrest. So that's the piece of the explanation that would go to the weight of that testimony. And that's why I don't want to go there.

But you can talk about how that evolved. On several occasions, he was there with other people, sometimes there was no evidence—I couldn't tell you right now which ones there was no one there and which ones there were multiple.

[Defense Counsel]: Yeah. There [were] four visits that preceded the search. Three or two of them had multiple people.

[Prosecutor]: Four by [Agent] Gerrity. Two by [APO] Anglemeyer. Six visits altogether before the search.

* * *

[Davis] was there every time by himself, other than [] two times.

* * *

[Defense Counsel]: To say that every time the agents were there, he was there implies that he had control over the house and because the jury is unaware he was obligated to be there is, I believe, impermissible.

Court: I'm allowing you to comment on the evidence as it came in, as it was said.

* * *

**I'm precluding you [from] concluding that he was the only [one] there every time the officers were there.** That was the part I thought was improper. Does that work?

*Id.* at 508-11 (emphasis added).

Immediately after the above discussion, the Commonwealth gave its closing argument and stated, in relevant part, as follows:

What does the evidence show us about who was present in the house with the marijuana, with the money, with the guns, with

- 27 -

the packaging materials when the police show up . . . . **It was only one person there that day. It was the defendant.**

Now you've heard evidence that [Davis] resided there. He told officers that he resided there. You heard from his property manager that he resided there. . . . [Y]ou heard that [Davis] lived there, and **he's the only one present that day**[.]

* * *

**[Davis] was the only one in that house. He was the only one there. We heard testimony from the agents that [Davis] was visited on a number of occasions previously at that residence. That's where he lived. That's where he was**.

*Id.* at 515, 525-26 (emphasis added); *see also id.* at 517 (Commonwealth characterizing residence as Davis' house); *id.* at 520-23, 525 (Commonwealth arguing Oliver, Mendoza, Morrison, and Maldonado-Davila did not live at 1401 N. 15th Street and had never lived at 1401 N. 15th Street and Davis lived there alone).

Based upon our review of the foregoing and the relevant case law, we conclude that the Commonwealth committed prosecutorial misconduct and the trial court erred in not awarding a mistrial. *See Gilliam*, *supra*. As we highlighted in the record above, it was well known to the Commonwealth that Davis was on house arrest at the **approved parole address**. Likewise, it was also well known that **other people lived at that residence and had been present at prior parole visits**. Nevertheless, the Commonwealth continued to misrepresent these facts throughout the case and in its opening and closing arguments. Indeed, in violation of the trial court's cautions and outright order prior to closing, the Commonwealth chose to repeatedly allege

- 28 -

that Davis was the only one in the home, and to infer that Davis lived there alone. As the Commonwealth poignantly phrased it, this created a "Hobson's choice" for Davis. **However, in our view, the Hobson's choice was inherently prejudicial to Davis, not the Commonwealth**. Davis had to either continue to let the Commonwealth manipulate facts in violation of the trial court's warnings and orders or admit to the jury that he was confined to that house because of his compliance with the conditions of his parole. Davis was unfairly placed between a rock and a hard place where both choices prejudiced him and were created by the Commonwealth's manipulation of facts and violations of the trial court's orders.[13] Therefore, the prosecutor committed misconduct and the trial court should have declared a mistrial.

In reaching this conclusion, we emphasize that it is the prosecutor's relentless pursuit of a single theory of the case, in violation of the trial court's orders, and refusal to heed the trial court's warnings and cautions that created the Hobson's choice that **prejudiced Davis**.[14] Indeed, for clarity, the

---

[13] Indeed, to the extent that, at trial, the Commonwealth averred Davis could have simply alerted the jury to his position on parole in order to bolster his defense, we would note such an assertion is absurd. We need not look further than the record of the instant case for support. The Commonwealth itself sought to introduce Davis' record under Rule 404(b), but the trial court **denied that request because it was unfairly prejudicial**. *See* Trial Court Opinion, 1/12/23, at 24-25; *see also* N.T. Jury Trial, 9/19/22, at 6-8. Despite the record not containing the Rule 404(b) motion or the corresponding hearing, it is apparent that the trial court denied the motion on this basis.

[14] We note that some of instances of the prosecutor's misconduct, taken in a vacuum, may appear inadvertent but when considered with the rest of the
*(Footnote Continued Next Page)*

Commonwealth's case rested upon the sole theory that Davis was the **lone individual residing in 1401 N. 15th Street**, and therefore, had sole unfettered access to the entire residence. **See** Trial Court Order and Opinion, 10/20/22, at 12-15 (expressing frustrations with Commonwealth and explaining Commonwealth theory of case). As the trial court noted during one of its many admonishments, the Commonwealth had full control over this investigation and the presentation of its case. The Commonwealth **knew** that Davis was not the only person who lived at the house, they **knew why** Davis was in that house, they **approved Davis to live there**, and they still **repeatedly misrepresented these facts to the jury**.[15]

_____

record as whole, lead to the inevitable conclusion that the prosecutor intentionally created this situation, flagrantly ignored his ethical responsibilities, and instead sought a conviction by any means necessary.

[15] Further, although not dispositive of the issue, the record is rife with examples of the Commonwealth failing to investigate relevant evidence that would have either supported or rejected their position. **See** N.T. Jury Trial, 9/19/22, at 227-32 (Agent Gerrity not taking names of other people who lived in **parole approved address**); **see also id.** at 78, 140-41 (officers did not seize Davis' keys and did not test keys on Davis' car to determine operability, despite Commonwealth claim Davis had access to basement bedroom as only means of access to driveway, or on doors in residence to ascertain which doors Davis actually had access to); **see also id.** at 359-62, 366 (Commonwealth exhibits depicting five sets of **other keys throughout residence** and none of those keys were tested on the front, back, or interior doors); **id.** at 419 ("[we] don't know what those keys are . . . [we] don't know anything about those keys. Nobody knows anything about those keys."); Commonwealth Exhibits 1, 11 (Commonwealth exhibits depicting it was possible to access rear of residence and driveway from front door, despite Commonwealth's repeated assertions that Davis had to walk past basement bedroom). Moreover, we note that the Commonwealth's own exhibits demonstrate that there were at least five toothbrushes in the bathroom, multiple pairs of shoes of varying

*(Footnote Continued Next Page)*

We further emphasize our displeasure with the trial court for failing to enforce its own rulings against the Commonwealth. Indeed, as we noted extensively, the trial court constantly warned the Commonwealth about its behavior and outright ordered the Commonwealth to cease misrepresenting the facts surrounding Davis' presence at the residence. Nevertheless, the trial court refused to enforce its own rulings and, coupled together with the prosecutor's misconduct, essentially permitted the Commonwealth to run roughshod over Davis' right to a fair trial. This type of conduct is simply untenable and impermissible. Finally, we do not rule on whether or not the prosecutor committed overreaching, as it is not raised before this Court, and, thus, it is within the trial court's purview upon remand to determine whether

---

sizes and style, and multiple beds. *See* Commonwealth Exhibits 10, 16, 17, 19, 21. Nevertheless, the Commonwealth repeatedly argued that these items were meant as deceptions and that no one could have slept in the beds. *See* Trial Court Opinion and Order, 10/20/22, at 12-17 (summarizing exhibits and Commonwealth arguments).

While we do not provide every example of investigative misstep we highlight some of these errors as they demonstrate, coupled with the consistent misconduct cited above, that the Commonwealth sought only one outcome above all others, with reckless disregard for the consequences, Davis' conviction.

Davis' right against double jeopardy prohibits retrial.[16]  Accordingly, we vacate Davis' sentences and convictions and remand for a new trial.[17]

Judgment of sentence reversed and vacated.  Convictions vacated.  Case remanded for a new trial.  Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>09/16/2025</u>

---

[16] We note that we do not condone the prosecution's behavior in any way, but are constrained to award Davis a new trial because he has only requested a new trial.  ***See Commonwealth v. Minnis***, 83 A.3d 1047, 1051-53 (Pa. Super. 2014) (compiling cases where this Court has previously remanded for new trial and, upon remand, trial court determined that prosecutorial misconduct had risen to prosecutorial overreach, double jeopardy barred retrial, and dismissed charges).

[17] In light of our disposition, we need not address Davis' remaining claims.